IN THE CIRCUIT COURT OF CAPE GIRARDEAU COUNTY, MISSOURI

MICHAEL R. SMYTHE,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)　　Case No.: 12CG-CC00327
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
RAYCOM MEDIA, INC.,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　)

**F I L E D**

DEC 1 3 2012

PATTI WIBBENMEYER
CIRCUIT CLERK

## PETITION FOR DECLARATORY JUDGMENT

COMES NOW the Plaintiff, Michael R. Smythe, by and through his attorney,

Mark S. Johnson of Johnson & Schneider, L.L.C., and, for his Petition for Declaratory

Judgment against the Defendant, Raycom Media, Inc., states as follows:

1.　　　That Plaintiff is an individual resident of Cape Girardeau County,

Missouri.

2.　　　That Defendant, Raycom Media, Inc., is a Delaware corporation that is

engaged in business in Cape Girardeau County, Missouri through its affiliate, KFVS,

LLC.

3.　　　That in December 1998, Defendant hired Plaintiff as a general sales

manager and thereafter in 2001 promoted Plaintiff to general manager of Defendant's

television station, KFVS/WQWQ, in Cape Girardeau County, Missouri.

4.　　　That in 1997, Defendant adopted the Raycom Media, Inc., 1997 Stock

Option Plan, which Defendant drafted, as more fully appears from a copy of that Stock

Option Plan which is attached hereto, marked Exhibit A and made a part hereof,

1

hereinafter referred to as "Stock Option Plan".

5.     That in 1997, Defendant adopted the Raycom Media, Inc., 1997 Restricted Stock Plan, which Defendant drafted, as more fully appears from a copy of that Restricted Stock Plan which is attached hereto, marked Exhibit B and made a part hereof, hereinafter referred to as "Restricted Stock Plan".

6.     That on November 29, 1999 and February 7, 2001, the Defendant granted to Plaintiff shares of its common stock under the Restricted Stock Plan.

7.     That on January 1, 1999, January 1, 2001, January 1, 2003, January 27, 2010 and December 5, 2011 Defendant granted Plaintiff shares of its common stock under the Stock Option Plan.

8.     That Defendant granted to Plaintiff a total of 29,178 shares of Defendant's common stock pursuant to the Stock Option Plan and Restricted Stock Plan.

9.     That the Plaintiff and Defendant executed a certain Shareholder's Agreement dated April 17, 2007 that governed the Plaintiff's ability to cause the Defendant to redeem his shares of stock and pay him the appraised value of same as more fully appears from a copy of that Shareholder's Agreement which is attached hereto, marked Exhibit C and made a part hereof.

10.    Plaintiff alleges upon information and belief that the Shareholder's Agreement has been amended by Defendant from time to time but that all those amendments are not in the possession of the Plaintiff.

2

11.     That on or about November 30, 2011 the Plaintiff and Defendant through
its affiliate, KFVS, LLC, entered into an agreement to facilitate the Plaintiff's retirement.

12.     That on or about February 27, 2012, Plaintiff accepted employment with
KBSI, another television station, in Cape Girardeau County, Missouri.

13.     That on or about March 20, 2012, Defendant purported to forfeit all of
Plaintiff's shares of stock that were issued pursuant to the Restricted Stock Plan, not the
Stock Option Plan, by letter issued from Rebecca S. Bryan, Vice President and General
Counsel of Defendant.

14.     That Defendant's action to forfeit some of Plaintiff's shares, pursuant to
the Defendant's letter of March 20, 2012 under the Restricted Stock Plan, was based
upon Plaintiff's alleged violation of the non-competition provision set forth in
paragraph 8.3 of the Restricted Stock Plan.

15.     That a controversy exists between Plaintiff and Defendant with respect to
his ownership rights in 29,178 shares of common stock of Defendant as follows:

(a)     Plaintiff contends that the forfeiture provisions contained in
paragraph 8.3 (non-competition) of the Restricted Stock Plan and paragraph 8.3 of the
Stock Option Plan are invalid under the law of the State of Delaware because those non-
competition provisions are not reasonable insofar as they contain no time or
geographical limitation and otherwise are not designed to protect a legitimate economic
interest of the Defendant;

(b)     That in the alternative to subparagraph (a), Plaintiff contends that

3

the Defendant only attempted to forfeit his rights to these shares of the common stock

Defendant granted Plaintiff pursuant to the Restricted Stock Plan and not the Stock

Option Plan as described in Rebecca S. Bryan's letter to the Plaintiff dated March 2,

2012;

(c)     That upon the determination by the Court that the non-competition

provisions contained in the Stock Option Plan and Restricted Stock Plan are invalid and

that Plaintiff be restored his rights to the stock granted pursuant to those plans as

referenced in the Shareholder's Agreement as those rights existed at the termination of

his employment with Defendant on November 30, 2011.

16.     That by virtue of the controversy described in the preceding paragraph,

Plaintiff seeks declaratory judgment pursuant to the provisions of Section 527.010 et

seq. of Mo.Rev.Stat and Rule 87.01 et seq. of the Missouri Rules of Civil Procedure so as

to construe the provisions by both the Restricted Stock Plan and Stock Option Plan and

Plaintiff's rights to the 29,178 of Defendant's stock previously granted by Defendant to

Plaintiff.

WHEREFORE, the Plaintiff respectfully requests this Court to enter declaratory

judgment against the Defendant as follows:

A.     Declaring that the forfeiture provisions contained in paragraph 8.3

of both the Restricted Stock Plan and Stock Option Plan are invalid and Plaintiff be

restored to his 29,178 shares of common stock in the Defendant;

B.     In the alternative to paragraph A, that the Court determine that the

4

Plaintiff is the owner of those number of shares of common stock issued by Defendant pursuant to the Stock Option Plan.

        C.      That upon Plaintiff being restored as the owner of any of the common stock of Defendant that Plaintiff shall have those rights of a shareholder under the Shareholder's Agreement of April 17, 2007 or any amendments thereof, as those rights existed at the time of Plaintiff's termination of employment with Defendant on November 30, 2011.

        D.      That this Court award such other and further relief as this Court deems just and proper in the circumstances.

JOHNSON & SCHNEIDER, L.L.C.

MARK S. JOHNSON   #32444
Attorney for Plaintiff

MARK S. JOHNSON
JOHNSON & SCHNEIDER, L.L.C.
212 North Main Street
Cape Girardeau, MO 63701
Telephone: 573-335-3300
Facsimile: 573-335-1978
www.johnsonschneider.com

FILED

DEC 13 2012

PATTI WIBBENMEYER
CIRCUIT CLERK

5

F I L E U
DEC 1 3 2012
PATTI WIBBENMEYER
CIRCUIT CLERK

EXHIBIT

A

RAYCOM MEDIA, INC.
1997 STOCK OPTION PLAN

## ARTICLE 1 - PURPOSE AND TERM OF PLAN

1.1    Purpose. The purposes of the Plan are to aid Raycom Media, Inc. ("Raycom Media") and its Subsidiaries (Raycom Media, Inc. and its Subsidiaries collectively being referred to herein as the "Company") in attracting and retaining Key Employees through a competitive compensation package, to stimulate the efforts of such Key Employees, to strengthen their desire to remain with the Company, to aid the Company in attracting superior individuals to serve as Nonemployee Directors and to provide appropriate compensation to such Nonemployee Directors for their service. Toward these objectives, the Board may grant Employee Stock Options to Key Employees on the terms and subject to the conditions set forth in the Plan.

1.2    Term. The Plan shall become effective as of September 3, 1997, subject to its approval by the shareholders of Raycom Media, Inc. No Awards shall be exercisable or payable before approval of the Plan has been obtained from Raycom Media's shareholders. Awards shall not be granted pursuant to the Plan after September 2, 2002.

## ARTICLE 2 - DEFINITIONS

2.1    Approved Reason. "Approved Reason" means a reason for terminating employment with the Company that, in the opinion of the Board, is in the best interests of the Company, as determined by the Board on a case-by-case basis in its sole discretion.

2.2    Award. "Award" means any form of Employee Stock Option issued to a Participant by the Board pursuant to such terms, conditions, restrictions, and limitations, if any, as the Board may establish by the Award Notice or otherwise.

2.3    Award Notice. "Award Notice" means a written notice from the Company to a Participant that establishes the terms, conditions, restrictions, and limitations applicable to an Award in addition to those established by this Plan and by the Board's exercise of its administrative powers.

2.4    Board. "Board" means the Board of Directors of Raycom Media, Inc.

2.5    Cause. "Cause" means theft from the Company, embezzlement of the Company's funds, falsification of the Company's records, fraud committed against the Company, commission of a felonious criminal act involving the Company or while engaged in conduct of the Company's business, incompetence due to the use of or reporting to work under the influence of alcohol, narcotics, other unlawful drugs or controlled substances, legal incapacity, insanity, act or acts involving dishonesty or misconduct which have or may reasonably be expected to have a material adverse effect on the business or reputation of the Company, breach of fiduciary duty to the

Company, willful and substantial failure to perform stated duties or lawful directives of the Board or of management of the Company.

2.6    Change In Control. "Change in Control" occurs if and when (a) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, other than (i) a person who is a shareholder of Raycom Media as of the effective date of the Plan, (ii) a person who becomes a shareholder of Raycom Media as a result of the exercise of Employee Stock Options granted under the Plan and (iii) any person who becomes a shareholder of Raycom Media by virtue of exercise of the "Warrants" (as defined in Section 13.2 of the Plan), becomes a "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Raycom Media representing 50.1% or more of the combined voting power of Raycom Media's then outstanding equity securities (assuming exercise of the Warrants); provided that a Change of Control shall not be deemed to occur as a result of a change of ownership resulting from the death of a shareholder, (b) individuals who constitute the Board on September 3, 1997 (the "Incumbent Board") have ceased for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to September 3, 1997 whose election, or nomination for election by Raycom Media's shareholders, was approved by a vote of at least three-quarters (3/4) of the directors comprising the Incumbent Board (either by a specific vote or by approval of the nomination of such person for election as Director without objection) shall be, for purposes of the Plan, considered as though such person were a member of the Incumbent Board, or (c) shareholders of Raycom Media approve (or, if shareholder approval is not required, the Board approves) (i) a merger or consolidation of Raycom Media with another corporation where those who are the shareholders of Raycom Media immediately prior to the merger or consolidation will not beneficially own, immediately after the merger or consolidation shares entitling such shareholders to vote 50.1% or more of all votes to which all shareholders of the surviving corporation would be entitled in the election of directors (assuming exercise of the Warrants), (ii) the sale or disposition of all or substantially all of Raycom Media's assets, or (iii) a plan of partial or complete liquidation of Raycom Media. Notwithstanding anything herein to the contrary, a Change in Control shall not take place upon the initial public offering of Raycom Media's Common Stock, or any other class of its securities.

2.7    Change In Control Price. "Change In Control Price" means (a) in the event shares of Common Stock are traded on a nationally recognized securities exchange or quotation system, the average closing price per share paid for the purchase of Common Stock on such exchange or system during the thirty (30) day period ending on the date the Change in Control occurs, and (b) in the event shares of Common Stock are not traded on such a nationally recognized securities exchange or quotation system, the fair market value per share of Common Stock immediately prior to the Change of Control as determined by the most recent annual independent appraisal, provided that in the event holders of shares of Common Stock receive cash, securities or other property for such shares as a result of the Change of Control, such fair market value of shares of Common Stock shall be based on the value of cash, securities or other property received per share of Common Stock.

2.8    Change in Ownership. "Change in Ownership" means the Lenders, in a single transaction or series of related transactions during a consecutive six (6) month period, exercise or sell all of the Warrants. as defined in Section 13.2 of the Plan.

2.9    Code. "Code" means the Internal Revenue Code of 1986, as amended from time to time, including regulations thereunder and successor provisions and regulations thereto.

2.10    Common Stock. "Common Stock" means Voting Common Stock, no par value per share, of Raycom Media, which may be newly issued, treasury stock, shares issued and outstanding or shares owned by a Subsidiary.

2.11    Company. "Company" means Raycom Media and its Subsidiaries.

2.12    Covered Employee. "Covered Employee" means an Employee who is a "Covered Employee" within the meaning of Section 162(m) of the Code.

2.13    Director. "Director" means a director of Raycom Media.

2.14    Disability. "Disability," in the case of a Key Employee, means a disability under the terms of the long-term disability plan maintained by the Company or any successor plan thereto. "Disability," in the case of a Nonemployee Director, means the permanent and lasting inability, by reason of physical or mental infirmity, or both, of a person to perform his or her duties as Director. Such Disability shall be determined exclusively by the Board, with or without reference to the certificate of a qualified physician. No Director whose Disability is to be determined shall participate in such determination.

2.15    Effective Date. "Effective Date" means the date an Award is determined to be effective by the Board upon its grant of such Award.

2.16    Employee. "Employee" means either (a) a salaried employee of Raycom Media or (b) a salaried employee of a Subsidiary.

2.17    Employee Stock Option. "Employee Stock Option" means an Award granted to a Key Employee or Nonemployee Director in the form of a stock option pursuant to Article 7.

2.18    Exchange Act. "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, including rules thereunder and successor provisions and rules thereto.

2.19    Key Employee. "Key Employee" means an Employee who holds a position of responsibility in a managerial, technical, production, administrative, or professional capacity.

2.20    Nonemployee Director. "Nonemployee Director" means a Director who is not an Employee.

1

2.21 <u>Participant</u>. "Participant" means any Key Employee or Nonemployee Director who has been selected for a grant of stock options pursuant to Article 7.

2.22 <u>Plan</u>. "Plan" means this Raycom Media, Inc. 1997 Stock Option Plan, as amended or modified from time to time.

2.23 <u>Retirement</u>. "Retirement" means, in the case of a Key Employee, for all Plan purposes other than Section 12.10, a termination of employment from the Company on or after attainment of Normal Retirement Age as defined under the Raycom Media, Inc. 401(k) Plan. "Retirement" means, in the case of a Nonemployee Director, for all Plan purposes other than Section 12.10, the termination of such Nonemployee Director's Service on or after age 70, or at any earlier age with the consent of the Board.

2.24 <u>Shareholders Agreement</u>. "Shareholders Agreement" means that certain Shareholders Agreement dated as of September 3, 1997, between the Company and the holders of Common Stock issued pursuant to the Plan.

2.25 <u>Subsidiary</u>. "Subsidiary" means a corporation or other business entity in which Raycom Media directly or indirectly has an ownership interest of 80 percent or more.

2.26 <u>Definitions in Article 13</u>. Capitalized terms used in Article 13 of the Plan and not otherwise defined in the Plan shall have the respective meanings attributed to them in Article 13.

## ARTICLE 3 - ELIGIBILITY

Only Key Employees and Nonemployee Directors are eligible to participate in Awards under the Plan. For purposes of the Plan, the Board shall select, from time to time, Participants from those Key Employees and Nonemployee Directors, respectively, who, in the opinion of the Board, can further the Plan's purposes. Once a Participant is so selected, the Board shall establish in the related Award Notices the terms, conditions, restrictions, and limitations, if any, applicable to the Awards in addition to those set forth in this Plan and the administrative rules and regulations issued by the Board.

## ARTICLE 4 - PLAN ADMINISTRATION

4.1 <u>Responsibility</u>. The Board shall have total and exclusive responsibility to control, operate, manage, and administer the Plan in accordance with its terms.

4.2 <u>Authority of the Board</u>. The Board shall have all the authority that may be necessary or helpful to enable it to discharge its responsibilities with respect to the Plan. Without limiting the generality of the preceding sentence, the Board shall have the exclusive right to: (a) interpret the Plan; (b) determine eligibility for the participation in the Plan; (c) decide all questions concerning eligibility for and the amount of Awards payable under the Plan; (d) construe any

ambiguous provision of the Plan; (e) correct any default; (f) supply any omission; (g) reconcile any inconsistency; (h) issue administrative guidelines as an aid to administer the Plan and make changes in such guidelines as it from time to time deems proper; (i) make regulations for carrying out the Plan and make changes in such regulations as it from time to time deems proper; (j) to the extent permitted under the Plan, grant waivers of Plan terms, conditions, restrictions, and limitations; (k) accelerate the vesting, exercise, or payment of an Award when such action or actions would be in the best interest of the Company; (l) subject to Section 7.2, grant Awards in replacement of Awards previously granted under this Plan or any other executive compensation plan of the Company; and (m) take any and all other action it deems necessary or advisable for the proper operation or administration of the Plan.

4.3     Discretionary Authority.  The Board shall have full discretionary authority in all matters related to the discharge of its responsibilities and the exercise of its authority under the Plan, including without limitation its construction of the terms of the Plan and its determination of eligibility for participation and Awards under the Plan.  It is the intent of the Plan that the decisions of the Board and its action with respect to the Plan shall be final, binding and conclusive upon all persons having or claiming to have any right or interest in or under the Plan.

4.4     Section 162(m) of the Code.  With regard to all Covered Employees, the Plan shall, for all purposes, be interpreted and construed in accordance with Section 162(m) of the Code.

4.5     Action by the Board.  The Board may act only by a majority of its members.  Any determination of the Board may be made, without a meeting, by a writing or writings signed by all of the members of the Board.  In addition, the Board may authorize any one or more of its number to execute and deliver documents on behalf of the Board.

4.6     Delegation of Authority.  The Board may delegate some or all of its authority under the Plan to any person or persons provided that any such delegation be in writing; provided, however, that only the Board may select and grant Awards to Participants who are subject to Section 16 of the Exchange Act or are Covered Employees.

4.7     Pledge Agreement and Shareholders Agreement.  No Award shall be made hereunder unless the recipient thereof agrees in writing to execute and deliver to the Company the pledge agreement provided for in this Section, Section 13.3 and the Shareholders Agreement.  No Common Stock shall be issued to any Participant under the Plan unless and until the Participant to whom Common Stock is to be issued has executed and delivered such pledge agreement and the Shareholders Agreement covering the Common Stock to be issued to such Participant.

## ARTICLE 5 - FORMS OF AWARDS

5.1     In General.  All Awards made hereunder shall be subject to the terms, conditions, restrictions and limitations of the Plan.  The Board may, in its sole judgment, subject an Award to such other terms, conditions, restrictions, and limitations (including, but not limited to, the time

and conditions of exercise and restrictions on transferability and vesting), provided they are not inconsistent with the terms of the Plan. Any combination of Awards may be granted at one time and on more than one occasion to the same Participant. For purposes of the Plan, the value of any Award granted in the form of Common Stock shall be the closing price at which a share of Common Stock trades on the date of the grant's Effective Date, or the next preceding trading day if such date was not a trading date, on the primary securities exchange or quotation system on which the Common Stock is then traded; or if the Common Stock is not then traded on a securities exchange or quotation system, the fair market value of such Common Stock determined on an annual basis by an independent expert hired for such purpose.

## ARTICLE 6 - SHARES SUBJECT TO PLAN

6.1     Available Shares.  The maximum number of shares of Common Stock that shall be available for grant of Awards under the Plan (including incentive stock options) during its term, shall not exceed Eight Hundred Fifty Thousand ($850,000), or such lesser number as may be the maximum number available under the terms of the agreements to which the Plan is subject, as referred to in Article 13 of the Plan. (Such amount shall be subject to adjustment as provided in Section 6.2.)  Any shares of Common Stock related to Awards that terminate by expiration, forfeiture, cancellation, or otherwise without the issuance or vesting of such shares shall be available once again for grant under the Plan. The maximum number of shares available for issuance under the Plan shall not be reduced to reflect any dividends or dividend equivalents that are reinvested into additional shares of Common Stock or credited as additional shares. The shares of Common Stock available for issuance under the Plan may be authorized and unissued shares, treasury shares, shares issued and outstanding or shares owned by a Subsidiary.

6.2     Adjustment to Shares.

6.2.1     In General.  The provisions of this Subsection 6.2.1 are subject to the limitation contained in Subsection 6.2.2.  If there is any change in the number of outstanding shares of Common Stock through the declaration of stock dividends, stock splits or the like, the number of shares available for Awards, the shares subject to any Award and the option prices or exercise prices of Awards shall be automatically adjusted. If there is any change in the number of outstanding shares of Common Stock through any change in the capital account of Raycom Media, or through a merger, consolidation, separation (including a spin-off or other distribution of stock or property), reorganization (whether or not such reorganization comes within the meaning of such term in Section 368(a) of the Code) or partial or complete liquidation, the Board shall make appropriate adjustments in the maximum number of shares of Common Stock that may be issued under the Plan and any adjustments and/or modifications to outstanding Awards as it, in its sole discretion, deems appropriate.  In event of any other change in the capital structure or in the Common Stock of Raycom Media, the Board shall also be authorized to make such appropriate adjustments in the maximum number of shares of Common Stock available for issuance under the Plan and any adjustments and/or modifications to outstanding Awards as it, in its sole discretion, deems appropriate. The maximum number of shares available

for issuance under the Plan shall be automatically adjusted to the extent necessary to reflect any dividend equivalents paid in the form of Common Stock. Notwithstanding anything to the contrary contained in this Subsection 6.2.1 or elsewhere in the Plan, no adjustment shall be made hereunder on account of any change in the number of outstanding shares of Common Stock by reason of the issuance of Common Stock pursuant to exercise of the Warrants (as defined in Section 13.2) other than such adjustment, if any, as may be required to comply with the provisions of the agreements referred to in Article 13 of the Plan.

6.2.2   Covered Employees. In no event shall the Award of any Participant who is a Covered Employee be adjusted pursuant to the Subsection 6.2 to the extent it would cause such Award to fail to qualify as "performance-based compensation" under Section 162(m) of the Code.

## ARTICLE 7 - EMPLOYEE STOCK OPTION PROGRAM

7.1   In General. Awards may be granted to Key Employees and Nonemployee Directors in the form of Employee Stock Options. These Employee Stock Options may be incentive stock options within the meaning of Section 422 of the Code or non-qualified stock options (i.e., stock options that are not incentive stock options), or a combination of both. All Awards under the Plan issued to Covered Employees in the form of Employee Stock Options shall qualify as "performance-based compensation" under Section 162(m) of the Code.

7.2   Terms and Conditions of Stock Options. An Employee Stock Option shall be exercisable in whole or in such installments and at such times as may be determined by the Board. The price at which Common Stock may be purchased upon exercise of an Employee Stock Option shall not be less than 100% of the closing price at which a share of Common Stock trades on the date of the grant's Effective Date, or the next preceding trading day if such date was not a trading date, on the primary securities exchange or quotation system on which the Common Stock is then traded, or, if the Common Stock is not then traded on a securities exchange or quotation system, the fair market value of such Common Stock as determined on an annual basis by an independent expert hired for such purpose. Moreover, all Options shall expire not later than 10 years from the Effective Date of the grant. Employee Stock Options shall not be repriced, i.e., there shall be no grant of an Employee Stock Option(s) to a Participant in exchange for a Participant's agreement to cancellation of a higher-priced Employee Stock Option(s) that was previously granted to such Participant.

7.3   Restrictions Relating to Incentive Stock Options. Employee Stock Options issued in the form of incentive stock options shall, in addition to being subject to the terms and conditions of Section 7.2, comply with Section 422 of the Code. Accordingly, the aggregate fair-market value (determined at the time the option was granted) of the Common Stock with respect to which incentive stock options are exercisable for the first time by a Participant during any calendar year (under this Plan or any other plan of the Company) shall not exceed $100,000 (or such other limit as may be required by the Code). The price at which Common Stock may be

purchased upon exercise of an incentive stock option shall not be less than 100% of the closing price at which a share of Common Stock trades on the date of the grant's Effective Date, or the next preceding trading day if such date was not a trading date, on the primary securities exchange or quotation system on which the Common Stock is then traded, or, if the Common Stock is not then traded on a securities exchange or quotation system, the fair market value of such Common Stock determined on an annual basis by an independent expert hired for such purpose. Notwithstanding the foregoing in the case of an incentive stock option granted to a Key Employee who at the time of grant owns (as is defined in Section 424(d) of the Code) stock of the Company or the Subsidiaries possessing more than 10% of the total combined voting power of all classes of stock of the Company or any of the Subsidiaries, the price at which Common Stock may be purchased upon exercise of such incentive stock option shall be not less than 110% of such price, on the Effective Date of the incentive stock option's grant. In no event may the price at which Common Stock may be purchased upon exercise of such incentive stock option be less than the par value of the Common Stock subject to such incentive stock option. From the maximum number of shares available for issuance under the Plan under Section 6.1, the number of shares of Common Stock that shall be available for incentive stock options granted under the Plan is 850,000 subject to the provisions of the agreements to which the Plan is subject, as referred to in Article 13 of the Plan.

7.4     Additional Terms and Conditions. The Board may, by way of the Award Notice or otherwise, establish such other terms, conditions, restrictions, and limitations, if any, of any Employee Stock Option Award, provided they are not inconsistent with the Plan.

7.5     Manner of Exercise. A participant may pay to the Company the option price of an Employee Stock Option (i) in cash, (ii) shares of Common Stock, (iii) a combination of the foregoing, or (iv) such other consideration as the Board may deem appropriate. The Board shall establish appropriate methods for accepting Common Stock, whether restricted or unrestricted, and may impose such conditions as it deems appropriate on the use of such Common Stock to exercise an Employee Stock Option. The Board may permit a Participant to satisfy any amounts required to be withheld under the applicable Federal, state and local tax laws, in effect from time to time, by electing to have the Company withhold a portion of the shares of Common Stock to be delivered for the payment of such taxes.

7.6     Nontransferability of Employee Stock Options. No Employee Stock Option granted pursuant to the Plan shall be transferable otherwise than by will or by the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code. During the lifetime of an optionee, the Employee Stock Option shall be exercisable only by the optionee personally or by the optionee's legal representative.

7.7     Vesting of Options.

7.7.1.  Subject to the terms of paragraph 7.7.2 hereof, the Employee Stock Options granted pursuant to this Plan shall be vested and exercisable over a ten (10) year period as follows:

(i)     Sixty Percent (60%) of the Employee Stock Option Award shall be vested and exercisable at any time after the third (3rd) anniversary of the Effective Date;

(ii)    Eighty Percent (80%) of the Employee Stock Option Award shall be vested and exercisable at any time after the fourth (4th) anniversary of the Effective Date; and

(iii)   One Hundred Percent (100%) of the Employee Stock Option Award shall be vested and exercisable at any time after the fifth (5th) anniversary of the Effective Date.

7.7.2  In the event of the termination of employment of a Participant because of death, Disability, Retirement, or for an Approved Reason, the Employee Stock Option held by such Participant shall become vested and exercisable on a pro-rata basis, based upon the period of time from grant of the Employee Stock Option to the termination of employment. In the event the Participant's employment with the Company terminates because of the Participant's death, Disability or Retirement, the Employee Stock Option shall remain exercisable, to the extent exercisable on the date the Participant's employment terminates, for the period ending one (1) year from the date of termination. In the event the Participant's employment with the Company terminates for any other reason, other than for Cause, the Employee Stock Option shall remain exercisable, to the extent exercisable on the date the Participant's employment terminates, for the period ending ninety (90) days from the date of termination. In the event the Participant's employment is terminated by the Company for Cause, the Employee Stock Option shall terminate, expire and be ~~forfeited on the date the~~ Participant's employment terminates.

7.7.3  The right to exercise any Employee Stock Option granted pursuant to this Plan shall be cumulative during the term thereof. Not less than 100 shares of Common Stock may be purchased upon the exercise of any part of the Employee Stock Option at any one time unless the number of shares of Common Stock purchased is the total number at the time purchased under the Employee Stock Option. No Employee Stock Option may be exercised for any fraction of a share of Common Stock.

7.8    <u>Maximum Award Payable</u>. Notwithstanding any provision contained in the Plan to the contrary, the maximum number of shares for which Employee Stock Options may be granted under the Plan to any one Participant for a calendar year is 500,000 shares of Common Stock, subject to the provisions of the agreements to which the Plan is subject, as referred to in Article 13 of the Plan.

## ARTICLE 8 - PAYMENT OF AWARDS

8.1    <u>In General</u>. Payment of Awards may include such terms, conditions, restrictions, and limitations, if any, as the Board deems appropriate, including restrictions on transfer and forfeiture provisions; provided, however, such terms, conditions, restrictions, and limitations are not inconsistent with the Plan.

8.2     Termination of Employment.  If employment with the Company of a Key Employee or Nonemployee Director who is a Participant terminates for a reason other than death, Disability, Retirement, or any Approved Reason, unpaid Awards granted hereunder, including, but not by way of limitation, Awards earned or exercised but not yet paid, all unpaid dividends and dividend equivalents, and all interest accrued on the foregoing shall be canceled or forfeited, as the case may be, unless the Participant's Award Notice provides otherwise.  The Board shall, notwithstanding Sections 4.4 and 12.9 to the contrary, have the authority to promulgate rules and regulations to determine the treatment of an Award under the Plan in the event of the Participant's death, Disability, Retirement or termination for an Approved Reason.

8.3     Noncompetition.  As to all Awards made hereunder unless the Award Notice specifies otherwise, a Participant shall forfeit all unpaid Awards, including, but not by way of limitation, Awards earned or exercised but not yet paid, all unpaid dividends and dividend equivalents and all interest, if any, accrued on the foregoing if, (i) in the opinion of the Board, the Participant, without the prior written consent of the Company, engages directly or indirectly in any manner or capacity as principal, agent, partner, officer, director, stockholder, employee, or otherwise, in any business or activity competitive with the business conducted by Raycom Media or any Subsidiary; (ii) at any time divulges to any person or any entity other than the Company any trade secrets, methods, processes or the proprietary or confidential information of the Company; or (iii) the Participant performs any act or engages in any activity that the Board determines is inimical to the best interests of the Company.  For purposes of this Section 8.3, a Participant shall not be deemed a stockholder if the Participant's record and beneficial ownership amount to not more than 5% of the outstanding capital stock of any company subject to the periodic and other reporting requirements of the Exchange Act.

8.4     Evidence of Ownership of Common Stock.  Upon exercise of an Employee Stock Option, ownership of Common Stock shall be evidenced by uncertificated shares as provided by Section 158 of the General Corporation Law of the state of Delaware.  The Company shall take all appropriate steps to properly register shares of Common Stock issued pursuant to the Plan in the name of such Participant.  Any evidence of ownership of shares shall bear an appropriate notification or other legend referring to the terms, conditions, and restrictions applicable to such Common Stock, including, without limitation the pledge agreement referred to in Sections 4.7 and 13.3 hereof.


## ARTICLE 9 - DIVIDEND AND DIVIDEND EQUIVALENTS

The Board may choose, at the time of the grant of an Award hereunder or any time thereafter up to the time of the Award's payment, to include as part of such Award an entitlement to receive dividends or dividend equivalents, subject to such terms, conditions, restrictions, and limitations, if any, as the Board may establish.  Dividends and dividend equivalents shall be paid in such form and manner (i.e., lump sum or installments) and at such time(s) as the Board shall determine.  All dividends or dividend equivalents that are not paid currently may, at the Board's discretion, accrue interest, be reinvested into additional shares of Common Stock.  The total

number of shares available for grant under Section 6.1 shall not be reduced to reflect any dividends or dividend equivalents that are reinvested into additional shares of Common Stock.

## ARTICLE 10. - DEFERRAL OF AWARDS

At the discretion of the Board, payment of any Award, dividend, or dividend equivalent, or any portion thereof, may be deferred by a Participant until such time as the Board may establish. All such deferrals shall be accomplished by the delivery of a written, irrevocable election by the Participant prior to the time established by the Board for such purpose, on a form provided by the Company. Further, all deferrals shall be made in accordance with administrative guidelines established by the Board to ensure that such deferrals comply with all applicable requirements of the Code. Deferred payments shall be paid in a lump sum or installments, as determined by the Board. Deferred Awards may also be credited with interest, at such rates to be determined by the Board and, with respect to those deferred Awards denominated in the form of Common Stock, with dividends or dividend equivalents.

## ARTICLE 11. - CHANGE IN CONTROL

11.1 Background. Notwithstanding any provision contained in the Plan, including, but not limited to, Sections 4.4 and 12.9, the provisions of this Article 11 shall control over any contrary provision; provided, however, that the provisions of this Article 11 shall not control over any contrary provision of Article 13, and any such provision of Article 13 shall control over any contrary provision in this Article 11. All participants shall be eligible for the treatment afforded by this Article if there is a Change in Ownership or if their employment terminates (including, construction termination) within one (1) year following a Change in Control, unless the termination is due to (i) death, (ii) Disability, (iii) Cause or (iv) Retirement.

11.2 Vesting and Lapse of Restrictions. If a Participant is eligible for treatment under this Article 11 all of the terms, conditions, restrictions and limitations in effect on any of his or her unexercised, unearned, unpaid and/or deferred Awards shall immediately lapse as of the date of the Change In Control.

11.3 Dividends and Dividend Equivalents. If a Participant is eligible for treatment under this Article 11, all of his or her unpaid dividends and dividend equivalents and all interest accrued thereon, if any, shall be treated and paid under this Article 11 in the identical manner and time as the Award under which such dividends or dividend equivalents have been credited.

11.4 Valuation of Awards. If a Participant is eligible for treatment under this Article 11 all outstanding shares of Common Stock shall be valued and cashed out in accordance with the Change in Control Price and shall be canceled; provided that any Employee Stock Options granted under this Plan having an exercise price equal to or greater than the Change in Control Price shall have a value of zero, shall be canceled, and the owner thereof shall not be entitled to any payment.

11.5   Payment of Awards.  If a Participant is eligible for treatment under this Article 11, he or she shall be paid, in a single lump sum cash payment, as soon as practicable but in no event later than 90 days after the date of the (i) Change of Ownership or (ii) termination of employment within one (1) year after a Change in Control for all of his or her Employee Stock Options.

11.6   Section 16 of the Exchange Act.  Notwithstanding anything contained in this Article 11 to the contrary, any Participant who, on the date of the Change In Control, holds any Employee Stock Options that have not been outstanding for a period of at least six months from their date of grant and who on such date is required to report under Section 16 of the Exchange Act shall not be paid such Award until the first business day next following the end of such six-month period.

11.7   Fair and Equitable Treatment.  Notwithstanding anything to the contrary contained in this Article 11, the Board may, in its discretion, treat Participants otherwise eligible for treatment under this Article 11 in such other fair and equitable manner as the Board, in its sole discretion, may determine; provided, however, that, in exercising its rights under this Section 11.7, the Board may not discriminate between Participants similarly situated.

## ARTICLE 12 - MISCELLANEOUS

12.1   Nonassignability.  No Awards rights shall be subject in any manner to alienation, anticipation, sale, transfer (except by will or the laws of descent and distribution), assignment, pledge, or encumbrance prior to payment pursuant to the Plan, except as otherwise provided in Sections 4.7 and 13.3 hereof.

12.2   Withholding Taxes.  The Company shall be entitled to deduct from any payment under the Plan, regardless of the form of such payment, the amount of all applicable income and employment taxes required by law to be withheld with respect to such payment or may require the Participant to pay to it such tax prior to and as a condition of the making of such payment.  In accordance with any applicable administrative guidelines it establishes, the Board may allow a Participant to pay the amount of taxes required by law to be withheld from an Award by withholding from any payment of Common Stock due as a result of such Award, or by permitting the Participant to deliver to the Company, shares of Common Stock having a fair-market value, as determined by the Board, equal to the amount of such required withholding taxes.

12.3   Amendments to Awards.  The Board may at any time unilaterally amend any unexercised, unearned, or unpaid Award, including, but not by way of limitation, Awards earned but not yet paid, to the extent it deems appropriate; provided, however, that any such amendment which, in the opinion of the Board, is adverse to the Participant shall require the Participant's consent.

12.4   No Right to Continued Employment or Grants.  Participation in the Plan shall not give any Employee any right to remain in the employ of Raycom Media or any Subsidiary.

Raycom Media, or, in the case of employment with a Subsidiary, the Subsidiary, reserves the right to terminate any Employee at any time. Further, the adoption of this Plan shall not be deemed to give any Employee or any other individual any right to be selected as a Participant or to be granted an Award.

12.5   Amendment/Termination. The Board may suspend or terminate the Plan at any time with or without prior notice. In addition, the Board may, from time to time and with or without prior notice, amend the Plan in any manner, but may not without shareholder approval adopt any amendment that would require the vote of the shareholders of Raycom Media pursuant to Section 16 of the Exchange Act or Section 162(m) of the Code, but only insofar as such amendment affects Covered Employees.

12.6   Governing Law. The Plan shall be governed by and construed in accordance with the laws of the State of Delaware, except as superseded by applicable Federal Law.

12.7   No Right, Title, or Interest in Company Assets. No Participant shall have any rights as a shareholder as a result of participation in the Plan until the date of issuance of a stock certificate in his or her name and, in the case of restricted shares of Common Stock, such rights are granted to the Participant under the Plan. To the extent any person acquires a right to receive payments from the Company under the Plan, such rights shall be no greater than the rights of an unsecured creditor of the Company and the Participant shall not have any rights in or against any specific assets of the Company. All of the Awards granted under the Plan shall be unfunded.

12.8   No Guarantee of Tax Consequences. No person connected with the Plan in any capacity, including, but not limited to, Raycom Media and its Subsidiaries and their directors, officers, agents and employees makes any representation, commitment, or guarantee that any tax treatment, including, but not limited to, Federal, state and local income, estate and gift tax treatment, will be applicable with respect to amounts deferred under the Plan, or paid to or for the benefit of a Participant under the Plan, or that such tax treatment will apply to or be available to a Participant on account of participation in the Plan.

12.9   Compliance with Section 162(m). If any provision of the Plan, other than the application of those contained in Articles 11 or 13 hereof, would cause the Awards granted to a Covered Person not to qualify as "performance-based compensation" under Section 162(m) of the Code, that provision, insofar as it pertains to the Covered Person, shall be severed from, and shall be deemed not to be a part of this Plan, but the other provisions hereof shall remain in full force and effect.

12.10   Other Benefits.   No Award granted under the Plan shall be considered compensation for purposes of computing benefits under any retirement plan of the Company nor affect any benefits or compensation under any other benefit or compensation plan of the Company now or subsequently in effect.

## ARTICLE 13 - PLAN SUBJECT TO CERTAIN AGREEMENTS

13.1    Loan and Credit Agreement. Raycom Media and certain of its subsidiaries have entered into a Loan and Credit Agreement dated as of September 12, 1996, with The Employees' Retirement System of Alabama and The Teachers' Retirement System of Alabama (collectively, the "Lenders") and The Teachers' Retirement System of Alabama, as Agent for the Lenders (the "Agent") (said Loan and Credit Agreement, as the same has heretofore been and may hereafter be amended, being herein referred to as the "Loan and Credit Agreement"). Under the provisions of Section 7.8 of the Loan and Credit Agreement the Plan must be in form and content approved in writing by the Lenders. All amendments to the Plan shall also be subject to the prior written approval of the Lenders. Section 7.8 of the Loan and Credit Agreement further requires that upon the issuance of any Common Stock to a Participant under the Plan, such stock shall be simultaneously pledged by the owner of such Common Stock to the Agent as security for the obligations of Raycom Media to the Lenders under the Loan and Credit Agreement, pursuant to the terms of a pledge agreement satisfactory in form to the Agent. Section 7.8 of the Loan and Credit Agreement further provides that no stock option or Common Stock may be issued or granted by Raycom Media under the Plan unless, immediately after the exercise of all such options and the issuance of all such Common Stock, the number of shares of Warrant Stock (as defined in the Warrant Agreement and the Warrants referred to in Section 15.2 below) then owned by the Lenders, together with Warrant Stock then issuable upon exercise of the Warrants (as defined in Section 15.2 below), is sufficient to enable the Lenders, after the exercise of the Warrants, to own, in the aggregate, at least 80% of the total equity interest of the holders of the Common Stock of Raycom Media.

13.2    Warrant Agreement and Warrants. Pursuant to a Warrant Agreement dated as of September 12, 1996, by and among Raycom Media and the Lenders (as the same may have heretofore been or may hereafter be amended, being herein referred to as the "Warrant Agreement"), Raycom Media has issued to the Lenders Warrants to purchase Common Stock of Raycom Media, Inc., dated September 12, 1996 (as the same may have heretofore been or may hereafter be amended, being herein referred to as the "Warrants"), upon the exercise of which the Lenders shall have the right to acquire not less than 80% of the outstanding equity interest of the holders of the Common Stock of Raycom Media.

13.3    Plan and Common Stock Issued Pursuant to Plan Subject to Agreements. The Plan and all Common Stock at any time and from time to time issued pursuant to the Plan are and shall be subject to all the provisions of the Loan and Credit Agreement, the Warrant Agreement, the Warrants and the Shareholders Agreement. As a condition precedent to the issuance of any Common Stock to any Participant under the Plan, such Participant must execute and deliver:

(a)    a pledge agreement in form and content acceptable to the Agent pledging to the Agent and granting to the Agent a security interest in such Common Stock to be issued to the Participant under the Plan, as collateral security for the obligations of Raycom Media to the Lenders under the Loan and Credit Agreement and related loan documents; and

(b)    the Shareholders Agreement.

14

All evidence of ownership of the Common Stock issued under the Plan shall be appropriately noted so as to comply with the Plan, the Loan and Credit Agreement, the Warrant Agreement, and the Shareholders Agreement. If any stock certificates are issued hereunder, such stock certificates, with executed blank stock powers, shall be delivered to the Agent to be held by the Agent so long as the security interest of the Agent therein shall remain in effect.



EXHIBIT
B

DEC 1 3 2012
PATTI WIBBENMEYER
CIRCUIT CLERK

## RAYCOM MEDIA, INC.
### 1997 RESTRICTED STOCK PLAN

### ARTICLE 1 - PURPOSE AND TERM OF PLAN

1.1    Purpose.    The purposes of the Plan are to aid Raycom Media, Inc. ("Raycom Media") and its Subsidiaries (Raycom Media, Inc. and its Subsidiaries collectively being referred to herein as the "Company") in attracting and retaining Key Employees through a competitive compensation package, to stimulate the efforts of such Key Employees, to strengthen their desire to remain with the Company, to aid the Company in attracting superior individuals to serve as Nonemployee Directors and to provide appropriate compensation to such Nonemployee Directors for their service. Toward these objectives, the Board may grant Restricted Stock Awards to Key Employees on the terms and subject to the conditions set forth in the Plan.

1.2    Term.    The Plan shall become effective as of October 22, 1997, subject to its approval by the shareholders of Raycom Media, Inc. No Awards shall be exercisable or payable before approval of the Plan has been obtained from Raycom Media's shareholders. Awards shall not be granted pursuant to the Plan after October 22, 2002.

### ARTICLE 2 - DEFINITIONS

2.1    Approved Reason.    "Approved Reason" means a reason for terminating employment with the Company that, in the opinion of the Board, is in the best interests of the Company, as determined by the Board on a case-by-case basis in its sole discretion.

2.2    Award.    "Award" means shares of Restricted Stock under the Restricted Stock Program issued to a Participant by the Board pursuant to such terms, conditions, restrictions, and limitations, if any, as the Board may establish by the Award Notice or otherwise.

2.3    Award Notice.    "Award Notice" means a written notice from the Company to a Participant that establishes the terms, conditions, restrictions, and limitations applicable to an Award in addition to those established by this Plan and by the Board's exercise of its administrative powers.

2.4    Board.    "Board" means the Board of Directors of Raycom Media, Inc.

2.5    Cause.    "Cause" means theft from the Company, embezzlement of the Company's funds, falsification of the Company's records, fraud committed against the Company, commission of a felonious criminal act involving the Company or while engaged in conduct of the Company's business, incompetence due to the use of or reporting to work under the influence of alcohol, narcotics, other unlawful drugs or controlled substances, legal incapacity, insanity, act or acts involving dishonesty or misconduct which have or may reasonably be expected to have a material adverse effect on the business or reputation of the Company, breach of fiduciary duty to the

Company, willful and substantial failure to perform stated duties or lawful directives of the Board or of management of the Company.

2.6     Change In Control. "Change in Control" occurs if and when (a) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, other than (i) a person who is a shareholder of Raycom Media as of the effective date of the Plan, (ii) a person who becomes a shareholder of Raycom Media as a result of the issuance of Restricted Stock pursuant to the Plan and (iii) any person who becomes a shareholder of Raycom Media by virtue of exercise of the "Warrants" (as defined in Section 13.2 of the Plan), becomes a "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Raycom Media representing 50.1% or more of the combined voting power of Raycom Media's then outstanding equity securities (assuming exercise of the Warrants); provided that a Change of Control shall not be deemed to occur as a result of a change of ownership resulting from the death of a shareholder, (b) individuals who constitute the Board on October 22, 1997 (the "Incumbent Board") have ceased for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to October 22, 1997 whose election, or nomination for election by Raycom Media's shareholders, was approved by a vote of at least three-quarters (3/4) of the directors comprising the Incumbent Board (either by a specific vote or by approval of the nomination of such person for election as Director without objection) shall be, for purposes of the Plan, considered as though such person were a member of the Incumbent Board, or (c) shareholders of Raycom Media approve (or, if shareholder approval is not required, the Board approves) (i) a merger or consolidation of Raycom Media with another corporation where those who are the shareholders of Raycom Media immediately prior to the merger or consolidation will not beneficially own, immediately after the merger or consolidation shares entitling such shareholders to vote 50.1% or more of all votes to which all shareholders of the surviving corporation would be entitled in the election of directors (assuming exercise of the Warrants), (ii) the sale or disposition of all or substantially all of Raycom Media's assets, or (iii) a plan of partial or complete liquidation of Raycom Media. Notwithstanding anything herein to the contrary, a Change in Control shall not take place upon the initial public offering of Raycom Media's Common Stock, or any other class of its securities.

2.7     Change In Control Price. "Change In Control Price" means (a) in the event shares of Common Stock are traded on a nationally recognized securities exchange or quotation system, the average closing price per share paid for the purchase of Common Stock on such exchange or system during the thirty (30) day period ending on the date the Change in Control occurs, and (b) in the event shares of Common Stock are not traded on such a nationally recognized securities exchange or quotation system, the fair market value per share of Common Stock immediately prior to the Change of Control as determined by the most recent annual independent appraisal, provided that in the event holders of shares of Common Stock receive cash, securities or other property for such shares as a result of the Change of Control, such fair market value of shares of Common Stock shall be based on the value of cash, securities or other property received per share of Common Stock.

2.8     Change in Ownership. "Change in Ownership" means the Lenders, in a single transaction or series of related transactions during a consecutive six (6) month period, exercise or sell all of the Warrants, as defined in Section 13.2 of the Plan.

2.9    Code. "Code" means the Internal Revenue Code of 1986, as amended from time to time, including regulations thereunder and successor provisions and regulations thereto.

2.10    Common Stock. "Common Stock" means Voting Common Stock, no par value per share, of Raycom Media, which may be newly issued, treasury stock, shares issued and outstanding or shares owned by a Subsidiary.

2.11    Company. "Company" means Raycom Media and its Subsidiaries.

2.12    Covered Employee. "Covered Employee" means an Employee who is a "Covered Employee" within the meaning of Section 162(m) of the Code.

2.13    Director. "Director" means a director of Raycom Media.

2.14    Disability. "Disability," in the case of a Key Employee, means a disability under the terms of the long-term disability plan maintained by the Company or any successor plan thereto. "Disability," in the case of a Nonemployee Director, means the permanent and lasting inability, by reason of physical or mental infirmity, or both, of a person to perform his or her duties as Director. Such Disability shall be determined exclusively by the Board, with or without reference to the certificate of a qualified physician. No Director whose Disability is to be determined shall participate in such determination.

2.15    Effective Date. "Effective Date" means the date an Award is determined to be effective by the Board upon its grant of such Award.

2.16    Employee. "Employee" means either (a) a salaried employee of Raycom Media or (b) a salaried employee of a Subsidiary.

2.17    Exchange Act. "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, including rules thereunder and successor provisions and rules thereto.

2.18    Key Employee. "Key Employee" means an Employee who holds a position of responsibility in a managerial, technical, production, administrative, or professional capacity.

2.19    Nonemployee Director. "Nonemployee Director" means a Director who is not an Employee.

2.20    Participant. "Participant" means any Key Employee or Nonemployee Director (or category thereof) who has been selected to participate in the Restricted Stock Program pursuant to Article 8.

2.21    Plan. "Plan" means this Raycom Media, Inc. 1997 Restricted Stock Plan, as amended or modified from time to time.

2.22    Restricted Stock. "Restricted Stock" means an Award of Common Stock subject to

the restrictions set forth in Section 7.3 awarded to a Key Employee or Nonemployee Director pursuant to Article 7.

2.23   Restricted Stock Award.  "Restricted Stock Award" means an Award granted pursuant to Article 7 in the form of shares of Restricted Stock.

2.24   Restricted Stock Program.  "Restricted Stock Program" means the program established under Article 7 of the Plan pursuant to which selected Key Employees or Nonemployee Directors receive Awards in the form of shares of Restricted Stock.

2.25   Restriction Period.  "Restriction Period" means the period of time beginning on the Effective Date of the grant of Performance Restricted Stock or Restricted Stock and ending on such date as the Board shall determine in its sole discretion.

2.26   Retirement.  "Retirement" means, in the case of a Key Employee, for all Plan purposes other than Section 12.10, a termination of employment from the Company on or after attainment of Normal Retirement Age as defined under the Raycom Media, Inc. 401(k) Plan. "Retirement" means, in the case of a Nonemployee Director, for all Plan purposes other than Section 12.10, the termination of such Nonemployee Director's Service on or after age 70, or at any earlier age with the consent of the Board.

2.27   Shareholders Agreement.  "Shareholders Agreement" means those certain Shareholders Agreements executed by the Company and the holders of Common Stock issued pursuant to the Plan.

2.28   Subsidiary.  "Subsidiary" means a corporation or other business entity in which Raycom Media directly or indirectly has an ownership interest of 80 percent or more.

2.29   Definitions in Article 13.  Capitalized terms used in Article 13 of the Plan and not otherwise defined in the Plan shall have the respective meanings attributed to them in Article 13.

## ARTICLE 3 - ELIGIBILITY

Only Key Employees and Nonemployee Directors are eligible to participate in Awards under the Plan.  For purposes of the Plan, the Board shall select, from time to time, Participants from those Key Employees and Nonemployee Directors, respectively, who, in the opinion of the Board, can further the Plan's purposes.  Once a Participant is so selected, the Board shall establish in the related Award Notices the terms, conditions, restrictions, and limitations, if any, applicable to the Awards in addition to those set forth in this Plan and the administrative rules and regulations issued by the Board.

## ARTICLE 4 - PLAN ADMINISTRATION

4.1    Responsibility. The Board shall have total and exclusive responsibility to control, operate, manage, and administer the Plan in accordance with its terms.

4.2    Authority of the Board. The Board shall have all the authority that may be necessary or helpful to enable it to discharge its responsibilities with respect to the Plan. Without limiting the generality of the preceding sentence, the Board shall have the exclusive right to: (a) interpret the Plan; (b) determine eligibility for the participation in the Plan; (c) decide all questions concerning eligibility for and the amount of Awards payable under the Plan; (d) construe any ambiguous provision of the Plan; (e) correct any default; (f) supply any omission; (g) reconcile any inconsistency; (h) issue administrative guidelines as an aid to administer the Plan and make changes in such guidelines as it from time to time deems proper; (i) make regulations for carrying out the Plan and make changes in such regulations as it from time to time deems proper; (j) to the extent permitted under the Plan, grant waivers of Plan terms, conditions, restrictions, and limitations; (k) accelerate the vesting, exercise, or payment of an Award when such action or actions would be in the best interest of the Company; (l) grant Awards in replacement of Awards previously granted under this Plan or any other executive compensation plan of the Company; and (m) take any and all other action it deems necessary or advisable for the proper operation or administration of the Plan.

4.3    Discretionary Authority. The Board shall have full discretionary authority in all matters related to the discharge of its responsibilities and the exercise of its authority under the Plan, including without limitation its construction of the terms of the Plan and its determination of eligibility for participation and Awards under the Plan. It is the intent of the Plan that the decisions of the Board and its action with respect to the Plan shall be final, binding and conclusive upon all persons having or claiming to have any right or interest in or under the Plan.

4.4    Section 162(m) of the Code. With regard to all Covered Employees, the Plan shall, for all purposes, be interpreted and construed in accordance with Section 162(m) of the Code.

4.5    Action by the Board. The Board may act only by a majority of its members. Any determination of the Board may be made, without a meeting, by a writing or writings signed by all of the members of the Board. In addition, the Board may authorize any one or more of its number to execute and deliver documents on behalf of the Board.

4.6    Delegation of Authority. The Board may delegate some or all of its authority under the Plan to any person or persons, including the President or Chief Executive Officer, provided that any such delegation be in writing; provided, however, that only the Board may select and grant Awards to Participants who are subject to Section 16 of the Exchange Act or are Covered Employees.

4.7    Pledge Agreement and Shareholders Agreement. No Award shall be made hereunder unless the recipient thereof agrees in writing to execute and deliver to the Company the pledge agreement provided for in this Section, Section 13.3 and the Shareholders Agreement. No Common Stock shall be issued to any Participant under the Plan unless and until the Participant to whom Common Stock is to be issued has executed and delivered such pledge agreement and the

Shareholders Agreement covering the Common Stock to be issued to such Participant.

## ARTICLE 5 - FORMS OF AWARDS

5.1    In General.  All Awards made hereunder shall be subject to the terms, conditions, restrictions and limitations of the Plan.  The Board may, in its sole judgment, subject an Award to such other terms, conditions, restrictions, and limitations (including, but not limited to, the time and conditions of exercise and restrictions on transferability and vesting), provided they are not inconsistent with the terms of the Plan.  Any combination of Awards may be granted at one time and on more than one occasion to the same Participant.  For purposes of the Plan, the value of any Award granted in the form of Common Stock shall be the closing price at which a share of Common Stock trades on the date of the grant's Effective Date, or the next preceding trading day if such date was not a trading date, on the primary securities exchange or quotation system on which the Common Stock is then traded; or if the Common Stock is not then traded on a securities exchange or quotation system, the fair market value of such Common Stock determined on an annual basis by an independent expert hired for such purpose.

## ARTICLE 6 - SHARES SUBJECT TO PLAN

6.1    Available Shares.  The maximum number of shares of Common Stock that shall be available for grant of Awards under the Plan (including incentive stock options) during its term, shall not exceed Nine Hundred Thousand (900,000), or such lesser number as may be the maximum number available under the terms of the agreements to which the Plan is subject, as referred to in Article 13 of the Plan.  (Such amount shall be subject to adjustment as provided in Section 6.2.)  Any shares of Common Stock related to Awards that terminate by expiration, forfeiture, cancellation, or otherwise without the issuance or vesting of such shares shall be available once again for grant under the Plan.  The maximum number of shares available for issuance under the Plan shall not be reduced to reflect any dividends or dividend equivalents that are reinvested into additional shares of Common Stock or credited as additional shares.  The shares of Common Stock available for issuance under the Plan may be authorized and unissued shares, treasury shares, shares issued and outstanding or shares owned by a Subsidiary.

6.2    Adjustment to Shares.

6.2.1    In General.  The provisions of this Subsection 6.2.1 are subject to the limitation contained in Subsection 6.2.2.  If there is any change in the number of outstanding shares of Common Stock through the declaration of stock dividends, stock splits or the like, the number of shares available for Awards, the shares subject to any Award shall be automatically adjusted.  If there is any change in the number of outstanding shares of Common Stock through any change in the capital account of Raycom Media, or through a merger, consolidation, separation (including a spin-off or other distribution of stock or property), reorganization (whether or not such reorganization comes within the meaning of such term in Section 368(a) of the Code) or partial or complete liquidation, the Board shall make appropriate adjustments in the maximum number of shares of Common Stock that may be issued under the Plan and any adjustments and/or

modifications to outstanding Awards as it, in its sole discretion, deems appropriate. In event of any other change in the capital structure or in the Common Stock of Raycom Media, the Board shall also be authorized to make such appropriate adjustments in the maximum number of shares of Common Stock available for issuance under the Plan and any adjustments and/or modifications to outstanding Awards as it, in its sole discretion, deems appropriate. The maximum number of shares available for issuance under the Plan shall be automatically adjusted to the extent necessary to reflect any dividend equivalents paid in the form of Common Stock. Notwithstanding anything to the contrary contained in this Subsection 6.2.1 or elsewhere in the Plan, no adjustment shall be made hereunder on account of any change in the number of outstanding shares of Common Stock by reason of the issuance of Common Stock pursuant to exercise of the Warrants (as defined in Section 13.2) other than such adjustment, if any, as may be required to comply with the provisions of the agreements referred to in Article 13 of the Plan.

6.2.2 <u>Covered Employees</u>. In no event shall the Award of any Participant who is a Covered Employee be adjusted pursuant to the Subsection 6.2 to the extent it would cause such Award to fail to qualify as "performance-based compensation" under Section 162(m) of the Code.

## ARTICLE 7 - RESTRICTED STOCK PROGRAM

7.1 <u>Purpose</u>. The purposes of the Restricted Stock Program are: (a) to promote the interests of the Company and its shareholders by providing a means to acquire a proprietary interest in the Company to selected Key Employees and Nonemployee Directors who are in a position to make a substantial contribution to the continued progress and success of the Company; (b) to attract and retain qualified individuals to serve as Employees and Directors in those positions; (c) to enhance long-term performance of the Company by linking a meaningful portion of the compensation of selected Key Employees and Nonemployee Directors to the achievement of specific long-term financial objectives of the Company; and (d) to motivate and reward selected Key Employees and Nonemployee Directors to undertake actions to increase the price of the Common Stock.

7.2 <u>Eligibility</u>. Any Key Employee and Nonemployee Director is eligible to participate in the Restricted Stock Program.

7.3 <u>Restricted Stock: Terms and Conditions</u>. Shares of Restricted Stock shall be subject to the following terms and conditions:

7.3.1 Subject to the provisions of the Plan and the Restricted Stock Agreement referred to in paragraph 7.3.4, until the expiration of the Restriction Period, the Participant shall not be permitted to sell, assign, transfer, pledge, or otherwise encumber shares of Restricted Stock except as provided in Sections 4.7 and 13.3 hereof.

7.3.2 Except as provided in this Section 7.3 and the Restricted Stock Agreement, the Participant shall have, with respect to the shares of Restricted Stock, all of the rights of a shareholder of the Company holding shares of the Common Stock, including, if

applicable, the right to receive any cash dividends. If so determined by the Board in the applicable Restricted Stock Agreement, dividends payable in Common Stock shall be paid in the form of Restricted Stock on which such dividend was paid, held subject to the same conditions and restrictions of the underlying Restricted Stock.

       7.3.3  Except to the extent otherwise provided in the applicable Restricted Stock Agreement, this Section 7.3.3 and Article 11, upon a Participant's termination of employment during an unexpired Restriction Period, all shares still subject to such unexpired Restriction Period held by that Participant shall be forfeited by that Participant. In the event of the termination of employment of a Participant because of death, Disability, Retirement, or for an Approved Reason, the unexpired Restriction Period(s) shall lapse as to a pro-rata portion of such Restricted Stock, which pro-rata portion shall be equal to the portion of the applicable Restriction Period(s) that has elapsed as of the date of such termination of employment, and such pro-rata portion shall become free of all restrictions and become fully vested and transferable subject to the provisions of the Shareholders Agreement and the pledge agreement referred to in Sections 4.7 and 13.3 hereof. The remaining portion of the Restricted Stock for which the Restriction Period has not expired shall be forfeited by the Participant.

      Notwithstanding anything contained in this Section 7.3.3 to the contrary, as to any Participant who, on the date of his or her termination of employment because of death, Disability, Retirement or for an Approved Reason, holds any Restricted Stock that has not been outstanding for a period of at least six months from the Effective Date of such Restricted Stock and who on the date of such termination is required to report under Section 16 of the Exchange Act, such Restricted Stock shall not become free of restrictions, vested, and transferable pursuant to this Section 7.3.3 until the first business day next following the end of such six-month period.

       7.3.4  Each Restricted Stock Award shall be confirmed by, and be subject to the terms of, a Restricted Stock Agreement which shall contain such terms and conditions not inconsistent with the terms hereof, as may be determined by the Board in its sole discretion. For purposes of Restricted Stock Awards made during 1997 the Restriction Period shall end on January 1, 2002.

      7.4  Evidence of Ownership of Common Stock. Ownership of Common Stock shall be evidenced by uncertificated shares as provided by Section 158 of the General Corporation Law of the state of Delaware. The Company shall take all appropriate steps to properly register shares of Common Stock issued pursuant to the Plan in the name of such Participant. Any evidence of ownership of shares shall bear an appropriate notification or other legend referring to the terms, conditions, and restrictions applicable to such Common Stock, including, without limitation the pledge agreement referred to in Sections 4.7 and 13.3 hereof.

## ARTICLE 8 - PAYMENT OF AWARDS

8.1     In General.  Payment of Awards may include such terms, conditions, restrictions, and limitations, if any, as the Board deems appropriate, including restrictions on transfer and forfeiture provisions; provided, however, such terms, conditions, restrictions, and limitations are not inconsistent with the Plan.

8.2     Termination of Employment.  If employment with the Company of a Key Employee or Nonemployee Director who is a Participant terminates for a reason other than death, Disability, Retirement, or any Approved Reason, unpaid Awards granted hereunder including, but not by way of limitation, Awards earned but not yet paid, all unpaid dividends and dividend equivalents, and all interest accrued on the foregoing shall be canceled or forfeited, as the case may be, unless the Participant's Award Notice provides otherwise.  The Board shall, notwithstanding Sections 4.4 and 12.9 to the contrary, have the authority to promulgate rules and regulations to determine the treatment of an Award under the Plan in the event of the Participant's death, Disability, Retirement or termination for an Approved Reason.

8.3     Noncompetition.  As to all Awards made hereunder unless the Award Notice specifies otherwise, a Participant shall forfeit all unpaid Awards, including, but not by way of limitation, Awards earned or exercised but not yet paid, all unpaid dividends and dividend equivalents and all interest, if any, accrued on the foregoing if, (i) in the opinion of the Board, the Participant, without the prior written consent of the Company, engages directly or indirectly in any manner or capacity as principal, agent, partner, officer, director, stockholder, employee, or otherwise, in any business or activity competitive with the business conducted by Raycom Media or any Subsidiary; (ii) at any time divulges to any person or any entity other than the Company any trade secrets, methods, processes or the proprietary or confidential information of the Company; or (iii) the Participant performs any act or engages in any activity that the Board determines is inimical to the best interests of the Company.  For purposes of this Section 8.3, a Participant shall not be deemed a stockholder if the Participant's record and beneficial ownership amount to not more than 5% of the outstanding capital stock of any company subject to the periodic and other reporting requirements of the Exchange Act.

## ARTICLE 9 - DIVIDEND AND DIVIDEND EQUIVALENTS

The Board may choose, at the time of the grant of an Award hereunder or any time thereafter up to the time of the Award's payment, to include as part of such Award an entitlement to receive dividends or dividend equivalents, subject to such terms, conditions, restrictions, and limitations, if any, as the Board may establish.  Dividends and dividend equivalents shall be paid in such form and manner (i.e., lump sum or installments) and at such time(s) as the Board shall determine.  All dividends or dividend equivalents that are not paid currently may, at the Board's discretion, accrue interest, be reinvested into additional shares of Common Stock.  The total number of shares available for grant under Section 6.1 shall not be reduced to reflect any dividends or dividend equivalents that are reinvested into additional shares of Common Stock.

## ARTICLE 10 - DEFERRAL OF AWARDS

At the discretion of the Board, payment of any Award, dividend, or dividend equivalent, or any portion thereof, may be deferred by a Participant until such time as the Board may establish. All such deferrals shall be accomplished by the delivery of a written, irrevocable election by the Participant prior to the time established by the Board for such purpose, on a form provided by the Company. Further, all deferrals shall be made in accordance with administrative guidelines established by the Board to ensure that such deferrals comply with all applicable requirements of the Code. Deferred payments shall be paid in a lump sum or installments, as determined by the Board. Deferred Awards may also be credited with interest, at such rates to be determined by the Board and, with respect to those deferred Awards denominated in the form of Common Stock, with dividends or dividend equivalents.

## ARTICLE 11 - CHANGE IN CONTROL

11.1  Background. Notwithstanding any provision contained in the Plan, including, but not limited to, Sections 4.4 and 12.9, the provisions of this Article 11 shall control over any contrary provision; provided, however, that the provisions of this Article 11 shall not control over any contrary provision of Article 13, and any such provision of Article 13 shall control over any contrary provision in this Article 11. All Participants shall be eligible for the treatment afforded by this Article if there is a Change in Ownership or if their employment terminates (including, constructive termination) within one (1) year following a Change in Control, unless the termination is due to (i) death, (ii) Disability, (iii) Cause or (iv) Retirement.

11.2  Vesting and Lapse of Restrictions. If a Participant is eligible for treatment under this Article 11 all of the terms, conditions, restrictions and limitations in effect on any of his or her unexercised, unearned, unpaid and/or deferred Awards shall immediately lapse as of the date of the Change In Control.

11.3  Dividends and Dividend Equivalents. If a Participant is eligible for treatment under this Article 11, all of his or her unpaid dividends and dividend equivalents and all interest accrued thereon, if any, shall be treated and paid under this Article 11 in the identical manner and time as the Award under which such dividends or dividend equivalents have been credited.

11.4  Valuation of Awards. If a Participant is eligible for treatment under this Article 11 all outstanding shares of Common Stock shall be valued and cashed out in accordance with the Change in Control Price and shall be canceled.

11.5  Payment of Awards. If a Participant is eligible for treatment under this Article 11, he or she shall be paid, in a single lump sum cash payment, as soon as practicable but in no event later than 90 days after the date of the (i) Change of Ownership or (ii) termination of employment within one (1) year after a Change in Control, for all of his or her shares of Common Stock.

11.6  Fair and Equitable Treatment. Notwithstanding anything to the contrary contained in this Article 11, the Board may, in its discretion, treat Participants otherwise eligible for treatment

under this Article 11 in such other fair and equitable manner as the Board, in its sole discretion, may determine; provided, however, that, in exercising its rights under this Section 11.6, the Board may not discriminate between Participants similarly situated.

### ARTICLE 12 - MISCELLANEOUS

12.1    Nonassignability. No Awards rights shall be subject in any manner to alienation, anticipation, sale, transfer (except by will or the laws of descent and distribution), assignment, pledge, or encumbrance prior to payment pursuant to the Plan, except as otherwise provided in Sections 4.7 and 13.3 hereof.

12.2    Withholding Taxes. The Company shall be entitled to deduct from any payment under the Plan, regardless of the form of such payment, the amount of all applicable income and employment taxes required by law to be withheld with respect to such payment or may require the Participant to pay to it such tax prior to and as a condition of the making of such payment. In accordance with any applicable administrative guidelines it establishes, the Board may allow a Participant to pay the amount of taxes required by law to be withheld from an Award by withholding from any payment of Common Stock due as a result of such Award, or by permitting the Participant to deliver to the Company, shares of Common Stock having a fair-market value, as determined by the Board, equal to the amount of such required withholding taxes.

12.3    Amendments to Awards. The Board may at any time unilaterally amend any unexercised, unearned, or unpaid Award, including, but not by way of limitation, Awards earned but not yet paid, to the extent it deems appropriate; provided, however, that any such amendment which, in the opinion of the Board, is adverse to the Participant shall require the Participant's consent.

12.4    No Right to Continued Employment or Grants. Participation in the Plan shall not give any Employee any right to remain in the employ of Raycom Media or any Subsidiary. Raycom Media, or, in the case of employment with a Subsidiary, the Subsidiary, reserves the right to terminate any Employee at any time. Further, the adoption of this Plan shall not be deemed to give any Employee or any other individual any right to be selected as a Participant or to be granted an Award.

12.5    Amendment/Termination. The Board may suspend or terminate the Plan at any time with or without prior notice. In addition, the Board may, from time to time and with or without prior notice, amend the Plan in any manner, but may not without shareholder approval adopt any amendment that would require the vote of the shareholders of Raycom Media pursuant to Section 16 of the Exchange Act or Section 162(m) of the Code, but only insofar as such amendment affects Covered Employees.

12.6    Governing Law. The Plan shall be governed by and construed in accordance with the laws of the State of Delaware, except as superseded by applicable Federal Law.

12.7    No Right, Title, or Interest in Company Assets. No Participant shall have any rights

as a shareholder as a result of participation in the Plan until the date of issuance of a stock certificate in his or her name and, in the case of restricted shares of Common Stock, such rights are granted to the Participant under the Plan. To the extent any person acquires a right to receive payments from the Company under the Plan, such rights shall be no greater than the rights of an unsecured creditor of the Company and the Participant shall not have any rights in or against any specific assets of the Company. All of the Awards granted under the Plan shall be unfunded.

12.8    No Guarantee of Tax Consequences. No person connected with the Plan in any capacity, including, but not limited to, Raycom Media and its Subsidiaries and their directors, officers, agents and employees makes any representation, commitment, or guarantee that any tax treatment, including, but not limited to, Federal, state and local income, estate and gift tax treatment, will be applicable with respect to amounts deferred under the Plan, or paid to or for the benefit of a Participant under the Plan, or that such tax treatment will apply to or be available to a Participant on account of participation in the Plan.

12.9    Compliance with Section 162(m). If any provision of the Plan, other than the application of those contained in Articles 11 or 13 hereof, would cause the Awards granted to a Covered Person not to qualify as "performance-based compensation" under Section 162(m) of the Code, that provision, insofar as it pertains to the Covered Person, shall be severed from, and shall be deemed not to be a part of this Plan, but the other provisions hereof shall remain in full force and effect.

12.10    Other Benefits. No Award granted under the Plan shall be considered compensation for purposes of computing benefits under any retirement plan of the Company nor affect any benefits or compensation under any other benefit or compensation plan of the Company now or subsequently in effect.

May 1998

## ARTICLE 13 - PLAN SUBJECT TO CERTAIN AGREEMENTS

13.1    Loan and Credit Agreement. Raycom Media and certain of its subsidiaries have entered into a Loan and Credit Agreement dated as of September 12, 1996, with The Employees' Retirement System of Alabama and The Teachers' Retirement System of Alabama (collectively, the "Lenders") and The Teachers' Retirement System of Alabama, as Agent for the Lenders (the "Agent") (said Loan and Credit Agreement, as the same has heretofore been and may hereafter be amended, being herein referred to as the "Loan and Credit Agreement"). Under the provisions of Section 7.8 of the Loan and Credit Agreement the Plan must be in form and content approved in writing by the Lenders. All amendments to the Plan, any designation of a Restriction Period for Restricted Stock Awards made after 1997, and all the terms, conditions, restrictions and limitations of any Performance Restricted Stock Program shall also be subject to the prior written approval of the Lenders. Section 7.8 of the Loan and Credit Agreement further requires that upon the issuance of any Common Stock to a Participant under the Plan, such stock shall be simultaneously pledged by the owner of such Common Stock to the Agent as security for the obligations of Raycom Media to the Lenders under the Loan and Credit Agreement, pursuant to the terms of a pledge agreement satisfactory in form to the Agent. Section 7.8 of the Loan and Credit Agreement further provides that no stock option or Common Stock may be issued or granted by Raycom Media under the Plan unless, immediately after the exercise of all such options and the issuance of all such Common Stock, the number of shares of Warrant Stock (as defined in the Warrant Agreement and the Warrants referred to in Section 15.2 below) then owned by the Lenders, together with Warrant Stock then issuable upon exercise of the Warrants (as defined in Section 15.2 below), is sufficient to enable the Lenders, after the exercise of the Warrants, to own, in the aggregate, at least 80% of the total equity interest of the holders of the Common Stock of Raycom Media.

13.2    Warrant Agreement and Warrants. Pursuant to a Warrant Agreement dated as of September 12, 1996, by and among Raycom Media and the Lenders (as the same may have heretofore been or may hereafter be amended, being herein referred to as the "Warrant Agreement"), Raycom Media has issued to the Lenders Warrants to purchase Common Stock of Raycom Media, Inc., dated September 12, 1996 (as the same may have heretofore been or may hereafter be amended, being herein referred to as the "Warrants"), upon the exercise of which the Lenders shall have the right to acquire not less than 80% of the outstanding equity interest of the holders of the Common Stock of Raycom Media.

13.3    Plan and Common Stock Issued Pursuant to Plan Subject to Agreements. The Plan and all Common Stock at any time and from time to time issued pursuant to the Plan are and shall be subject to all the provisions of the Loan and Credit Agreement, the Warrant Agreement, the Warrants and the Shareholders Agreement. As a condition precedent to the issuance of any Common Stock to any Participant under the Plan, such Participant must execute and deliver:

(a)    a pledge agreement in form and content acceptable to the Agent pledging to the Agent and granting to the Agent a security interest in such Common Stock to be issued to the Participant under the Plan, as collateral security for the obligations of Raycom Media to the Lenders under the Loan and Credit Agreement and related loan documents; and

(b)    the Shareholders Agreement.

All evidence of ownership of the Common Stock issued under the Plan shall be appropriately noted so as to comply with the Plan, the Loan and Credit Agreement, the Warrant Agreement, and the Shareholders Agreement. If any stock certificates are issued hereunder, such stock certificates, with executed blank stock powers, shall be delivered to the Agent to be held by the Agent so long as the security interest of the Agent therein shall remain in effect.

# RAYCOM MEDIA, INC.
## SHAREHOLDERS AGREEMENT

**THIS SHAREHOLDERS AGREEMENT** (this "Agreement") is executed as of **April 17, 2007** by and among **RAYCOM MEDIA, INC.**, a Delaware corporation (the "Company"), and **Michael R. Smythe**, individually, a "Shareholder", and together with all the remaining Shareholders of the Company who have executed Shareholders Agreement collectively referred to as, the "Shareholders").

### RECITALS:

WHEREAS, the Company has implemented the Raycom Media, Inc. 1997 Restricted Stock Plan (the "Restricted Stock Plan") and the Raycom Media, Inc. 1997 Stock Option Plan (the "Stock Option Plan", and together with the Restricted Stock Plan, the "Plans"), as they may be amended, modified or supplemented from time to time in accordance with the terms and pursuant to the conditions of the Plans; and

WHEREAS, it is a condition to the issuance of shares of the Company's Common Stock, no par value, pursuant to the Plans, that the Company and any recipient of Common Stock pursuant to the Plans enter into a Shareholders Agreement (including the entering into of this Agreement by the Shareholder).

### AGREEMENT:

NOW, THEREFORE, in consideration of the mutual promises, representations, warranties, covenants, and conditions set forth herein, the parties hereby mutually agree as follows:

1.     Certain Definitions.   As used in this Agreement, the following terms shall have the following respective meanings:

"Affiliate" of a person shall mean any person, controlling, controlled by, or under the common control of such person.

"Appraised Value" shall mean the per share price of Common Stock obtained by the Company on June 30, 1997, and thereafter on an annual basis no later than February 28 of each year.

"Cause" shall have the meaning set forth in the Plans.

"Certificate" shall mean the Certificate of Incorporation of the Company, as amended from time to time.

"Commission" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"Common Stock" shall mean the Company's Common Stock, no par value, then outstanding, but shall not include any Common Stock issued pursuant to exercise of the Warrants.

"Disability" shall have the meaning set forth in the Plans.



FILED

DEC 13 2012

PATTI WIBBENMEYER
CIRCUIT CLERK

EXHIBIT
C

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"Holder" or "Holders" shall mean any person holding Common Stock or any person to whom the Common Stock has been transferred in compliance with the terms of the respective Shareholders Agreement executed by each of the Shareholders.

"IPO" shall mean the Company's initial public offering of Common Stock pursuant to a firm commitment underwriting agreement registered with the Commission.

"Loan Agreement" shall mean the Loan and Credit Agreement dated as of September 12, 1996, entered into by the Company and certain of its subsidiaries, The Teachers' Retirement System of Alabama, as agent and on its own behalf, and The Employees' Retirement System of Alabama, as amended, modified and supplemented from time to time.

"Plans" shall have the meaning set forth in the Recitals to this Agreement.

"Pledge Agreement" shall mean the Pledge Agreement to be executed by each of the Shareholders in favor of The Teachers' Retirement System of Alabama, as Agent under the Loan Agreement, covering the Common Stock held by the Shareholders, as amended, modified and supplemented from time to time.

"Redeem" shall mean the purchase by the Company of Common Stock pursuant to this Agreement.

"Redemption Period" shall mean the month of March in each year.

"Restricted Stock Plan" shall have the meaning set forth in the Recitals to this Agreement.

"Restriction Period" shall have the meaning set forth in the Restricted Stock Plan.

"Retirement" shall have the meaning set forth in the Plans.

"Securities Act" shall mean the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"Stock Option Plan" shall have the meaning set forth in the Recitals to this Agreement.

"Transfer" shall mean a sale, assignment, encumbrance, gift, bequest, pledge, hypothecation or other disposition of Common Stock or any interest therein.

"Transferee" shall mean a person to whom a Transfer is made or is proposed to be made.

"Warrant Agreement" shall mean the Warrant Agreement dated as of September 12, 1996, entered into by the Company, The Employees' Retirement System of Alabama and The Teachers' Retirement System of Alabama, as amended, modified and supplemented from time to time.

"Warrants" shall mean the warrants issued pursuant to the Warrant Agreement, as amended, modified and supplemented from time to time.

2.   <u>Transferability</u>.

2.1   <u>Restrictions on Transferability</u>.   The Common Stock shall not be Transferred except upon compliance with the provisions of the Securities Act, the Certificate, the Pledge Agreement and this Agreement, and any attempted Transfer of any Common Stock other than in accordance with the terms hereof and thereof is void <u>ab initio</u> and transfers no right, title or interest in or to such Common Stock, whether now owned or hereafter acquired, to the purported Transferee, buyer, donee, assignee or encumbrance holder. Each party to this Agreement will cause any proposed Transferee (other than a Transferee of securities sold pursuant to a registration or pursuant to Rule 144 or Rule 145(d) under the Securities Act) of the Common Stock to agree to take and hold such securities subject to the provisions and upon the conditions specified herein and therein.

2.2   <u>Restrictive Legend</u>.   Each certificate, if any, representing the Common Stock issued pursuant to the Plans shall be stamped or otherwise imprinted with a legend in the following form (in addition to any legend required under applicable state securities laws):

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"). THE SECURITIES MAY NOT BE SOLD OR OFFERED FOR SALE OR OTHERWISE DISTRIBUTED EXCEPT IN CONJUNCTION WITH AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE ACT, OR IN COMPLIANCE WITH RULE 144, RULE 145(d) OR PURSUANT TO ANOTHER EXEMPTION THEREFROM. THE SECURITIES ARE ALSO SUBJECT TO PROVISIONS OF THE CERTIFICATE OF INCORPORATION, A WARRANT AGREEMENT, A PLEDGE AGREEMENT AND A SHAREHOLDERS AGREEMENT, WHICH CONTAIN RESTRICTIONS ON TRANSFER, RIGHTS OF FIRST REFUSAL, AND OTHER PROVISIONS. COPIES OF THOSE DOCUMENTS MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY."

If the Common Stock is uncertificated, the written notice required by § 151(f) of the Delaware General Corporation Law sent to the registered owners of the Common Stock shall contain substantially the information contained in the foregoing legend.

2.3   <u>Notice of and Request for Consent to Proposed Transfers; Securities Law Compliance</u>.   Each Holder of shares of Common Stock by acceptance of ownership thereof agrees to comply in all respects with the provisions of this Agreement and the Pledge Agreement. Prior to any proposed Transfer of any Common Stock, unless there is in effect a registration statement under the Securities Act covering the proposed Transfer, the Holder thereof shall give written notice to the Company of such Holder's intention to effect such Transfer and request the Company's approval of the proposed Transfer, in compliance with Section 2.4. Each such notice shall describe the manner and circumstances of the proposed Transfer in sufficient detail (including but not limited to, the name of the proposed Transferee), and shall be accompanied by either (i) an unqualified written opinion of legal counsel who shall be reasonably satisfactory to the Company addressed to the Company and reasonably satisfactory in form and substance to the Company's counsel, to the effect that the proposed Transfer of the Common Stock

may be effected without registration under the Securities Act, (ii) a "no action" letter from the staff of the Commission to the effect that the distribution of such securities without registration will not result in recommendation by the staff of the Commission that action be taken with respect thereto, or (iii) such other showing that may be reasonably satisfactory to legal counsel to the Company, whereupon the Holder of such Common Stock shall be entitled to Transfer such Common Stock in accordance with the terms of the notice delivered by the Holder to the Company, provided, however, that the Transfer must comply with the provisions of Section 2.4 and shall be subject to the provisions of Section 3.

2.4     Transfers Restricted.  The Shareholders and the Company have determined that it is in the best interest of the Shareholders and the Company that all the outstanding Common Stock be held by employees or directors of the Company or both until such time as the Board of Directors of the Company and the Shareholders determine otherwise, subject, however, to the rights of the holders of the Warrants. Accordingly, no Shareholder may make any Transfer of Common Stock (including but not limited to any Transfer to any third party under Section 3 of this Agreement) unless and until the Shareholder proposing the Transfer has obtained from the Company its written consent to the proposed Transfer. No Transfer of any of the Common Stock by any Shareholder may be made to any Transferee other than the Company, except as otherwise approved by the Board of Directors of the Company.

3.     Rights of First Refusal.

3.1     First Offer Rights.  A Shareholder desiring to Transfer Common Stock in compliance with Section 2 and this Section 3 (a "Selling Shareholder") shall first deliver written notice to the Company (hereinafter referred to as the "Notice of Offer") which Notice of Offer shall specify (i) the number of shares of Common Stock owned by the Selling Shareholder which such Selling Shareholder wishes to sell (the "Offered Common Stock"); (ii) the proposed cash purchase price per share for the Offered Common Stock (the "Offer Price"); (iii) the identity of the proposed Transferee of the Offered Common Stock; and (iv) all other terms and conditions of the offer and shall request the Company consent to such Transfer. The Notice of Offer shall constitute an irrevocable offer by the Selling Shareholder to sell to the Company the Offered Common Stock at the Offer Price under the same terms and conditions contained in the Notice of Offer, whether or not the Company consents to the proposed Transfer.

3.2     Company Notice.  Within thirty (30) days following its receipt of the Notice of Offer, the Company, whether or not it consents to the Transfer, may notify the Selling Shareholder as to the number of shares of the Offered Common Stock, if any, that it is electing to purchase (such notification shall be referred to hereinafter as the "Company Acceptance"). The election to purchase Offered Common Stock shall be made on behalf of the Company and approved by those members of the Board of Directors of the Company who are not the Selling Shareholder or Affiliates of the Selling Shareholder. The Company Acceptance shall be deemed to be an irrevocable commitment to purchase from the Selling Shareholder the number of the Offered Common Stock which the Company has elected to purchase pursuant to the Company Acceptance, subject, however, to the provisions of Section 3.6.

3.3    Sale by Selling Shareholder. If the Company, in its sole and exclusive discretion, delivers to the Selling Shareholder written consent to the proposed Transfer and does not deliver a Company Acceptance within thirty (30) days following its receipt of the Notice of Offer providing for the purchase by the Company of all of the Offered Common Stock, the Selling Shareholder (a) shall be under no obligation to sell to the Company that part of the Offered Common Stock that the Company has not elected to purchase (the "Remaining Stock"), and (b) may, within a period of sixty (60) days from the date of the Notice of Offer, sell all, but not less than all, the Remaining Stock to one or more third parties (each a "Third Party Transferee"), for cash at a price per share not less than the Offer Price and on such other terms and conditions as are no more favorable to the proposed Third Party Transferee than those specified in the Notice of Offer; provided, however, that if there is more than one Third Party Transferee, the Selling Shareholder in good faith must obtain binding and definitive commitments to purchase all the Remaining Stock within such 60-day period before any sale to a Third Party Transferee of the Remaining Stock may take place. Upon any such sale, each Third Party Transferee of such Remaining Stock shall execute an agreement in form and substance satisfactory to the Company and pursuant to which such Third Party Transferee agrees that the shares of Remaining Stock it acquired from the Selling Shareholder are subject to the provisions of this Agreement and the Pledge Agreement. Any Third Party Transferee to whom shares of Common Stock are transferred pursuant to and in compliance with this Section 3.3 shall, upon consummation of such transfer, be deemed a Shareholder. If the Selling Shareholder does not complete the sale of the Remaining Stock within such 60-day period, the provisions of this Section 3 shall again apply, and no sale of Common Stock held by the Selling Shareholder shall be made otherwise than in accordance with the terms of this Agreement.

3.4    Closing. The closing of purchases of Offered Common Stock by the Company (or its designees) pursuant to this Section 3 shall take place on the earlier to occur of May 1 or November 1 next succeeding the date of the Notice of Offer, at 11:00 A.M. local time at the principal offices of the Company, or at such other date, time or place as the parties to the sale may agree; provided, however, that the closing shall be deferred for such additional period of time as may be necessary for the obtaining of any Federal Communications Commission or other governmental approval that may be required for such purchase of Offered Common Stock. At least five (5) business days prior to such closing, the Company shall notify the Selling Shareholder in writing of the portion of the Offered Common Stock to be purchased by the Company and the name or names of, and the number of shares to be purchased by each of, the designees of the Company. At such closing, the Selling Shareholder shall sell, transfer and deliver to the Company and each of its designees full right, title and interest in and to the Offered Common Stock so purchased, free and clear of all liens, security interests or adverse claims of any kind and nature (except as otherwise set forth in the Pledge Agreement and this Agreement), and shall deliver to the Company and each of its designees (a) if the shares of Common Stock are represented by certificates, a certificate or certificates representing the Offered Common Stock sold, in each case duly endorsed for transfer by or accompanied by appropriate stock transfer powers duly endorsed with signatures guaranteed by a commercial bank, trust company or registered broker dealer or (b) if the shares of Common Stock are uncertificated, a written instruction to the Company, as custodian of the books and records upon which the registration of ownership of shares of Common Stock and the transfer of shares of Common Stock are registered, to make appropriate entries of the transfer in favor of the purchaser or purchasers of the Offered Common Stock. Simultaneously with delivery of such certificate or certificates or such instruction, the Company and each of its designees of the Offered Common Stock shall deliver to the Selling Shareholder, by wire transfer of immediately available funds to such bank and account as the Selling Shareholder shall designate, a cash amount equal to the product of the Offer Price and the number of Offered Common Stock being acquired by such purchaser, in full payment of the purchase price of the shares of Offered Common Stock purchased.

3.5     Designated Purchasers.  In exercising its rights under this Section 3, the Company may also designate one or more nominees to purchase some or all of the Offered Common Stock instead of purchasing the Offered Common Stock itself.

3.6     Company's Performance Excused.  Notwithstanding anything herein to the contrary, and regardless of the fact that the Company has given a Company Acceptance under Section 3.2, the Company shall have no obligation to close the purchase of, or to pay the purchase price for, any of the Offered Common Stock under this Section 3 if, at the time of the closing of such purchase or the making of such payment, (a) an Event of Default has occurred under the Loan Agreement, or (b) such purchase or payment would cause such an Event of Default or (c) such purchase or payment would not be permitted under applicable law.  In any such event, the Company shall not be in default hereunder for failure to close such purchase or pay such purchase price under this Section 3.

4.     Redemption of Common Stock.

4.1     Right to Cause Redemption.  A Shareholder (or his estate, if he is deceased) whose employment has ceased by reason of death, Disability or Retirement shall have the right to require the Company to redeem all or any of such Shareholder's Common Stock on the terms hereinafter provided in this Section 4.  Any such Shareholder desiring to have the Company Redeem his shares of Common Stock in compliance with this Section 4 (a "Redeeming Shareholder") shall deliver written notice to the Company of his intent to cause the redemption (hereinafter referred to as the "Notice of Redemption"), which Notice of Redemption shall specify the number of shares of Common Stock owned by the Redeeming Shareholder which such Redeeming Shareholder wishes to have redeemed (the "Redeemed Common Stock").  To be effective, the Notice of Redemption must be received by the Company within the Redemption Period.  The Notice of Redemption shall constitute an irrevocable offer by the Redeeming Shareholder to sell to the Company the Redeemed Common Stock at the Appraised Value obtained by the Company immediately prior to the Notice of Redemption, subject, however, to the provisions of Section 4.3.  This Section 4 shall not apply to any Common Stock issued as Restricted Stock for which the applicable Restriction Period has not lapsed or otherwise been terminated.

4.2     Closing.  The closing of the redemption of the Redeemed Common Stock pursuant to this Section 4 shall take place on the earlier to occur of May 1 or November 1 next succeeding the date of the Notice of Redemption, at 11:00 A.M. local time at the principal offices of the Company, or at such other date, time or place as the parties may agree; provided, however, that the closing shall be deferred for such additional period of time as may be necessary for the obtaining of any Federal Communications Commission or other governmental approval that may be required for such redemption.  At such closing, the Redeeming Shareholder shall sell, transfer and deliver to the Company full right, title and interest in and to the Redeemed Common Stock so purchased, free and clear of all liens, security interests or adverse claims of any kind and nature, and shall deliver to the Company (a) if the shares of Common Stock are represented by certificates, a certificate or certificates representing the Offered Common Stock sold, in each case duly endorsed for transfer by or accompanied by appropriate stock transfer powers duly endorsed with signatures guaranteed by a commercial bank, trust company or registered broker dealer or (b) if the shares of Common Stock are uncertificated, a written instruction to the Company, as custodian of the books and records upon which the registration of ownership of shares of Common Stock and the transfer of shares of Common Stock are registered, to make appropriate entries of the transfer in favor of the Company.  Simultaneously with delivery of such certificate or certificates or such instruction, the Company shall deliver to the Redeeming Shareholder the redemption price determined by multiplying the Appraised Value by the number of shares of Redeemed Common Stock being acquired by the Company.  In the case of an estate of

a Shareholder or a Shareholder who is retired or whose employment with the Company has terminated because of Disability, the Company shall have the option of paying for such shares of Redeemed Common Stock by wire transfer of immediately available funds or by paying fifty percent (50%) of the redemption price by wire transfer and the balance with a promissory note payable in equal annual installments over a two (2) year period, with interest at the *Wall Street Journal* prime as of the closing date. In all other cases, the Company shall have the option of paying for such shares of Redeemed Common Stock by wire transfer of immediately available funds or by paying twenty-five percent (25%) of the redemption price by wire transfer and the balance with a promissory note payable in equal annual installments over a three (3) year period, with interest at the *Wall Street Journal* prime as of the closing date.

4.3   Company's Performance Excused.   Notwithstanding anything herein to the contrary, the Company shall have no obligation (a) to redeem any Common Stock under this Section 4 or to make any payment on a promissory note issued pursuant to Section 4.2 if, at the time of the closing of such redemption or the making of such proposed payment, an Event of Default has occurred under the Loan Agreement or such redemption or payment on the promissory note would cause such an Event of Default; or (b) to redeem any Common Stock under this Section 4 if such redemption would not be permitted under applicable law. In any such event, the Company shall not be in default hereunder for failure to make or close any redemption under this Section 4 or to make any payment under the terms of any promissory note issued pursuant to Section 4.2 hereof.

5.   Option To Redeem.

5.1   Company's Option.   At any time a Shareholder ceases for any reason to be employed by the Company, the Company shall have the option to redeem all or any part of the Common Stock held by such Shareholder (or his estate). This Section 5 shall apply to Common Stock issued as Restricted Stock only on and after the lapse (including any lapse resulting from termination of employment) of the applicable Restriction Period. The Company shall deliver written notice to the Shareholder of its intent to effect the redemption (hereinafter referred to as the "Notice of Company Redemption"), which Notice of Company Redemption shall specify the number of shares of Common Stock owned by the Shareholder which the Company intends to Redeem. To be effective, the Notice of Company Redemption must be received by the Shareholder within sixty (60) days following (a) termination of employment, as to Common Stock owned by the Shareholder at the time of termination of employment (including any Restricted Stock the Restriction Period with respect to which has lapsed or will lapse as a result of such termination of employment), (b) the date of exercise of the relevant stock option, as to any Common Stock issued subsequent to termination of employment upon exercise of any stock option issued under the Stock Option Plan, or (c) the lapse of the relevant Restriction Period, as to Restricted Stock the Restriction Period for which has not lapsed before or as a result of the termination of employment. A Notice of Company Redemption may also be given by the Company during any Redemption Period subsequent to the applicable dates set forth above. The Notice of Company Redemption shall constitute an irrevocable exercise by the Company of the option to purchase the Shareholder's (or his estate's) Common Stock at the Appraised Value obtained by the Company immediately prior to the Notice of Company Redemption, subject, however, to the provisions of Section 5.3.

5.2   Closing.   The closing of any redemption pursuant to this Section 5 shall take place on the earlier to occur of May 1 or November 1 next succeeding the date of the Notice of Company Redemption, at 11:00 A.M. local time at the principal offices of the Company, or at such other date, time or place as the parties may agree; provided, however, that the closing shall be deferred for such additional period of time as may be necessary for the obtaining of any Federal Communications Commission or other

governmental approval that may be required for such redemption. At such closing, the Shareholder (or other Holder thereof) shall sell, transfer and deliver to the Company full right, title and interest in and to the Common Stock covered by the Notice of Company Redemption, free and clear of all liens, security interests or adverse claims of any kind and nature, and shall deliver to the Company (a) if the shares of Common Stock are represented by certificates, a certificate or certificates representing the Offered Common Stock sold, in each case duly endorsed for transfer by or accompanied by appropriate stock transfer powers duly endorsed with signatures guaranteed by a commercial bank, trust company or registered broker dealer or (b) if the shares of Common Stock are uncertificated, a written instruction to the Company, as custodian of the books and records upon which the registration of ownership of shares of Common Stock and the transfer of shares of Common Stock are registered, to make appropriate entries of the transfer in favor of the Company. Simultaneously with delivery of such certificate or certificates or instruction, the Company shall deliver to the Shareholder the redemption price determined by multiplying the Appraised Value by the number of shares of Common Stock being acquired by the Company pursuant to the Notice of Company Redemption. The purchase price paid by the Company pursuant to this Section 5 shall be by wire transfer of immediately available funds.

        5.3   <u>Company's Performance Excused</u>. Notwithstanding anything herein to the contrary, and regardless of the fact the Company has given a Notice of Redemption under Section 4.1, the Company shall have no obligation to close such redemption or make any payment of the redemption price with respect thereto if, at the time of the closing of such redemption or the payment of the redemption price, (a) an Event of Default has occurred under the Loan Agreement, (b) such redemption or payment on the promissory note would cause such an Event of Default or (c) the closing of such redemption or such payment would not be permitted under applicable law. In any such event, the Company shall not be in default hereunder for failure to close such redemption or make any payment of the redemption price under this Section 5.

        6.   <u>Optional and Mandatory Participation in Sale of Common Stock</u>. If at any time the holder or holders of a majority of the then outstanding Common Stock (the "Majority Holder", whether or more) desires to sell, exchange or otherwise dispose of (collectively, "sell") any of the shares of Common Stock owned by the Majority Holder, the Majority Holder shall provide all other Holders of Common Stock (the "Other Holders") with a notice (the "Sale Notice") and shall comply with the applicable provisions of this Section 6. The Sale Notice shall describe in reasonable detail (a) the number of shares of Common Stock to be sold; (b) the name and address of the proposed purchaser thereof (the "Purchaser"); (c) the proposed sale price; and (d) all other material terms of the proposed sale.

        Upon receipt of the Sale Notice, each Other Holder shall have the option to participate in the sale on the same terms as the Majority Holder, subject to this Section 6 (the "Participation Right"). Within ten (10) days after receipt of the Sale Notice, each Other Holder desiring to exercise his Participation Right shall notify the Majority Holder of such intention in writing. The Majority Holder shall not sell any of its shares of Common Stock to the Purchaser unless and until each Other Holder who has elected to exercise his Participation Right is granted the right to sell to the Purchaser his Common Stock on the terms set forth in this section. The Majority Holder and the Other Holders who exercise their Participation Rights shall sell to the Purchaser either (a) all the shares proposed to be sold by them; or (b) a number of shares of the Common Stock equal to the number of shares of Common Stock described in the Sale Notice; provided, however, that if the number of shares of Common Stock to be purchased is less than the number of shares described in clause (a) or (b) above, the shares of Common Stock held by the Majority Holder shall be sold first, and the shares of the Common Stock owned by the Other Holders who exercise their Participation Rights shall be sold only to the extent that the Purchaser is willing to purchase shares of Common Stock in

excess of those to be sold by the Majority Holder. Notwithstanding any other provisions of this Section 6, the Majority Holder shall not have the right to consummate the sale of all or a portion of the amount of the Common Stock to the Purchaser in accordance with the terms of the Sale Notice if, following compliance with all other rights of the Other Holders under this Section, the Purchaser declines, for any reason, to purchase all or any portion of the Common Stock subject to the Participation Rights.

If at any time the Majority Holder desires to sell all the shares of Common Stock owned by the Majority Holder, the Majority Holder shall have the right to require each Other Holder who has not elected to exercise his Participation Right to sell his shares of Common Stock to the Purchaser as if such Participation Rights had been exercised, so as to effect a sale of 100% of the outstanding Common Stock. In order to exercise the right granted in this paragraph to the Majority Holder, the Sale Notice shall include a statement that the Majority Holder proposes to sell all of the Majority Holder's shares of Common Stock and has elected to exercise its rights under this paragraph. Each Shareholder agrees that he will join with the Majority Holder in the sale of all the Common Stock of the Company to the Purchaser and will cooperate fully with the Majority Holder in effectuating such sale, including but not limited to taking all action necessary to effectuate the transfer of the Other Holders' Common Stock to the Purchaser upon receipt by the Other Holders of the agreed purchase price. If any Other Holder shall fail or refuse to fulfill his obligations under this Section 6, the Majority Holders (or any one of them) shall have the power of an agent and attorney-in-fact for each of the Other Holders, which power shall be coupled with an interest and not be revocable, to take all action necessary to consummate the sale to the Purchaser of the Common Stock owned by the Other Holders who have so failed or refused to carry out their obligations under this Section 6, as fully and for all purposes as if such action had been taken by such Other Holders as required under this Section 6.

7.   Miscellaneous.

7.1   Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama applicable to contracts between Alabama residents entered into and to be performed entirely within the State of Alabama.

7.2   Enforcement.   The parties expressly agree that the provisions of this Agreement may be specifically enforced against each of the parties hereto in any court of competent jurisdiction.

7.3   Successors and Assigns.   Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors, and administrators of the parties hereto.

7.4   Entire Agreement.   This Agreement, together with the documents referred to herein, constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof and supersedes all prior oral or written (and all contemporaneous oral) agreements or understandings with respect to the subject matter hereof.

7.5   Notices, etc.   All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, or otherwise delivered by hand, messenger or facsimile transmission, addressed:  (a) if to Shareholder or a Transferee of Shareholder, at such Shareholder's address set forth below his/her signature set forth in this Agreement, or at such other address as such Shareholder or its Transferee shall have furnished to the Company in writing, or (b) if to the Company, at Raycom Media, Inc., RSA Tower, 201

Monroe Street, Montgomery, Alabama 36104, Attention: General Counsel (telecopy number 334-206-1555, or at such other address as the Company shall have furnished to the Shareholder.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or as having been given when delivered, if delivered by hand or by messenger (or overnight courier), 24 hours after confirmed receipt if sent by facsimile transmission or at the earlier of its receipt or on the fifth day after mailing as aforesaid.

7.6     Delays or Omissions.  No delay or omission to exercise any right, power or remedy accruing to any party hereto upon any breach or default of the Company under this agreement, shall impair any such right, power or remedy of such holder nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereunder occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement, or by law or otherwise afforded to any party, shall be cumulative and not alternative.

7.7     Counterparts.  This Agreement may be executed in any number of counterparts, each of which may be executed by less than all of the parties hereto, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

7.8     Severability.  If any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

7.9     Amendments.  The provisions of this Agreement may be amended at any time and from time to time, and particular provisions of this Agreement may be waived, with and only with an agreement or consent in writing signed by the Company and by the holders of at least a majority of the Common Stock covered by this Agreement and the Shareholders Agreements executed by the other Shareholders.

7.10     Jurisdiction.  The parties hereto irrevocably submit, in any legal action or proceeding relating to this Agreement, to the exclusive jurisdiction of the courts of the State of Alabama and consent that any such action or proceeding may be brought in such courts and waive any objection that they may now or hereafter have to the venue of such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient forum.

7.11     Termination.  The provisions of this Agreement shall terminate upon the earlier of (a) the closing of an IPO or (b) the twentieth (20th) anniversary of the effective date of this Agreement.

7.12     Joinder by Certain Other Holders of Common Stock.  The Company and the holders of all the outstanding shares of Common Stock of the Company not issued pursuant to the Plans have entered into a Shareholders Agreement effective as of May 2, 1996, as the same has been amended, modified and supplemented from time to time (the "Existing Shareholders Agreement").  The Existing Shareholders Agreement provides that on September 12, 1999, the Common Stock covered by the Existing

Shareholders Agreement shall automatically become subject to all the provisions of the Stock Option Plan, except for any provisions thereof for vesting of rights with respect to Common Stock issued under the Stock Option Plan. The holders of the Common Stock covered by the Existing Shareholders Agreement may join in the execution of a Shareholders Agreement identical to this Agreement, whereupon the Common Stock covered by the Existing Shareholders Agreement shall become subject to all the provisions of a Shareholders Agreement identical to this Agreement and shall be deemed fully vested under the Stock Option Plan.

7.13    Agreement Not Applicable to Common Stock Issued Under Warrants.    This Agreement shall not apply to any Common Stock issued pursuant to exercise of the Warrants.

7.14    Joinder in Warrant Agreement.    The Shareholder, by his or her execution and delivery of this Agreement, joins in and becomes a party to the Warrant Agreement, solely with respect to Section 16 thereof.

The foregoing Shareholders Agreement is hereby executed as of the date first above written.

RAYCOM MEDIA, INC.

By: _Paul H. McTear Jr._

Name:   Paul H. McTear, Jr.
Title:    President

SHAREHOLDER:

By: _Michael R. Smythe_

Michael R. Smythe
KFVS
310 Broadway
Cape Girardeau, MO 63701